

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | | |
|---|---|---|
| EDWARD JOSEPH HOGAN | § § | |
| Plaintiff, | § § | |
| | § | CIVIL ACTION NO. _____ |
| VS. | § § | |
| | § | |
| AMERICAN STANDARD, INC., ET AL. | § § | |
| Defendants. | § | |

## GENERAL ELECTRIC COMPANY'S AND FOSTER WHEELER LLC'S NOTICE OF REMOVAL

TO THE HONORABLE JUDGE OF UNITED STATES DISTRICT COURT:

Pursuant to Title 28 U.S.C. § 1442(a)(1) and 1446, Defendants General Electric Company and Foster Wheeler LLC (collectively referred to as "defendants" or individually as "GE" or "Foster Wheeler"), give notice of removal of an action filed against them in the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York. In support, defendants respectfully offer the following:

### Preliminary Matters

1.      On, or about, May 22, 2008, plaintiff filed this lawsuit, entitled Edward Joseph Hogan, Index No. 08-107210, against GE, Foster Wheeler and numerous other defendants in the Supreme Court of the State of New York, New York County. See Summons and Verified Complaint attached hereto as Exhibit A.

2.    Plaintiff served both GE and Foster Wheeler with Plaintiff's Summons and Verified Complaint on June 3, 2008. The Verified Complaint did not state plaintiff's claims in a manner or in sufficient detail to inform defendants that the case was removable. *See Madden v. Able Supply Co.,* 205 F. Supp. 2d 695, 698 (S.D. Tex. 2002) (stating that if the initial pleading does not provide details of plaintiff's claims, the 30-day time period begins on the date defendant receives "other paper" specifically indicating grounds for removal). Prior to serving the Summons and Verified Complaint, plaintiffs' counsel forwarded a copy of Plaintiff's Answers To Defendants' Fourth Amended Standard Set Of Interrogatories ("Discovery Responses") which were received on May 28, 2008. *See* Discovery Responses attached hereto as Exhibit B. Plaintiff's Discovery Responses include allegations that Edward Joseph Hogan was exposed to asbestos while in the United States Navy and aboard a Navy ship between 1942 and 1945. *Id.* at Chart A. More specifically, there are allegations of exposure while working as a seaman aboard the USS South Dakota.

3.    Thus, this Notice of Removal is timely filed in that it is filed within thirty (30) days after the receipt by GE and Foster Wheeler of "other paper" from which it ascertained that this case is removable. 28 U.S.C. § 1446(b).

## Nature Of The Case

4.    The case is based on plaintiff's allegations that Edward Joseph Hogan's asbestos-related disease, specifically lung cancer, was caused by his exposure to asbestos dust and/or fibers.

5.      Plaintiff asserts failure to warn claims against GE and Foster Wheeler and asserts strict liability and negligence claims, including failure to warn, against all other defendants based on various theories.

### Grounds For Removal

6.      This Notice of Removal is filed within thirty (30) days of plaintiffs' service of Plaintiff's service of Plaintiff's Responses to Defendant's Fourth Amended Standard Set of Interrogatories which constitutes "other paper." 28 U.S.C. § 1446(b). GE manufactured marine steam turbines for use on Navy ships pursuant to contracts and specifications executed by the Navy. GE has confirmed that its marine steam turbines were on the USS South Dakota. In addition, Foster Wheeler manufactured marine boilers and auxiliary equipment for use on Navy ships pursuant to contracts and specifications executed by the Navy. Foster Wheeler has confirmed that its economizers were on the USS South Dakota. The basis for removal is that, in the manufacture and sale of turbines, boilers and other equipment for the Navy, including all aspects of warnings associated with those turbines, boilers and equipment, defendants were acting under an officer or agency of the United States within the meaning of 28 U.S.C. § 1442(a)(1).

7.      Should plaintiff file a motion to remand this case, defendants respectfully request an opportunity to respond more fully in writing, but offer the following authorities at this time:

8.      As recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504 (1988), defendants have a federal defense to this action, *i.e.,* government contractor immunity from liability for injuries arising from any exposure to asbestos related to turbines, boilers and auxiliary equipment on board Navy vessels, insofar as they were constructed or repaired by defendants. Removal pursuant to 28 U.S.C. § 1442(a)(1) is appropriate where the moving party can (1) demonstrate that it

acted under the direction of a federal officer, (2) raise a colorable federal defense to plaintiffs' claims, and (3) demonstrate a causal nexus between plaintiff's claims and acts it performed under color of federal office. *Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 134-35 (1989).

9.    In *Isaacson v. Dow Chemical Company*, 304 F.Supp.2d 442 (E.D.N.Y. 2004), plaintiff originally sued the manufacturer of Agent Orange in New Jersey State Court. Defendants removed to federal court asserting, among other things, federal jurisdiction under the All Writs Act. *Id.* at 445. The New Jersey District Court found removal appropriate under the All Writs Act. *Id.* The case was then transferred to the Eastern District of New York by the Multidistrict Panel. *Id.* The Court of Appeals for the Second Circuit affirmed the district court's denial of remand finding jurisdiction appropriate under the All Writs Act. *Stephenson v. Dow Chemical Company*, 273 F.3d 19 (2d Cir. 2003). On review, the United States Supreme Court remanded the case finding that the All Writs Act alone would not support removal. *Dow Chemical Company v. Stephenson*, 539 U.S. 111 (2003). On remand from the Supreme Court, the Second Circuit determined that jurisdiction could not be grounded in the All Writs Act and remanded the case back to the Eastern District of New York to determine if there was an alternative ground supporting federal jurisdiction. *Stephenson v. Dow Chemical Company*, 346 F.3d 19 (2d Cir. 2003). It is with that extensive procedural history that the district court examined the federal officer removal statute and found it sufficient to deny plaintiff's motion to remand. *Isaacson,* 304 F.Supp. at 445.

10.    In reaching its conclusion, the *Isaacson* court discussed in detail the three elements necessary for removal under this statute. First, a defendant must demonstrate that it is a "person" within the meaning of the statute. *Id.* at 446. The definition of a "person" includes a corporation. *Id.* Second, the defendant must establish that the suit is "for any act under color of federal office,"

i.e., there is a causal connection between the charged conduct and asserted official authority. *Id.* (citations omitted). Causation exists if the predicate acts of the state court suit were undertaken while the person was acting as or under a federal officer, and the acts were under color of the relevant federal office. *Id.* Third, defendants must raise a colorable claim to a federal law defense. *Id.* As previously stated, a colorable claim to a federal defense can be predicated upon the federal government contractor defense. *Id.* at 449.

11.    The second element requires a causal nexus between the defendant's actions under the federal officer and plaintiff's state court claims. *Id.* at 447.  A substantial degree of direct and detailed federal control over defendant's work is required. *Id.*  What constitutes sufficient federal control is often central to a court's decision to uphold removal or remand a case. Several courts have upheld removal because defendants were sued as a result of building products pursuant to military specifications. *See Crocker v. Borden*, 852 F.Supp. 1322 (E.D.La. 1994)(holding that removal was proper for Westinghouse because its marine turbines were manufactured pursuant to Navy specifications); *see also, Pack v. AC and S, Inc.*, 838 F.Supp. 1099 (D.Md. 1993)(holding that removal was proper for Westinghouse because the government had extensive control over the manufacture of turbines, even specifying the type of asbestos cloth). Not all courts agree, however, on the amount of federal control necessary to uphold removal under this statute.

12.    New York courts have not always viewed this issue consistently.  Prior to the *Isaacson* case, the Eastern District Court remanded a similar matter involving Agent Orange.  In *Ryan v. Dow Chemical Company*, 781 F.Supp. 934, 950 (E.D.N.Y. 1992), the district court remanded the case because it found that the control by the government was not sufficient to meet the requirements of section 1442(a)(1). The district court reasoned that the government sought only to

buy a ready-to-order herbicide from the defendant and did not cause or control the production of the unwanted byproduct, dioxin, which was the alleged cause of the injuries. *Id.*

13.     In discussing *Ryan*, the *Isaacson* court acknowledged that it was a contradictory decision. *Isaacson,* 304 F.Supp. at 445. It declared, however, that the *Ryan* decision was "no longer persuasive" and went on to discuss Fifth Circuit cases that specifically rejected the *Ryan* conclusion. *See Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 392 (5th Cir. 1998)(holding that manufacturer of Agent Orange was entitled to removal pursuant to the federal officer removal statute); *see also, Miller v. Dow Chemical Company*, 275 F.3d 414, 417 (5th Cir. 2001)(also holding that manufacturer of Agent Orange was entitled to removal pursuant to the federal officer removal statute). The *Isaacson* court denied remand based on facts that were almost identical to those in *Ryan*. The *Isaacson* court concluded that the government ordered specifications differed from the specifications for the defendants' commercial application of the product. *Isaacson, supra* at 450. In addition, the method of warning and application was completely in the government's hands. *Id.* Finally, the government had full knowledge of the dioxin "problem" inherent in the production of Agent Orange. *Id.* These factors demonstrated the control with which the government operated and, thus, warranted a different holding than *Ryan*. *Id.*

14.     The present case is substantially similar to *Isaacson*. In constructing its marine steam turbines for the Navy, GE acted under the direction of a federal officer. *See* Affidavit of David Hobson attached hereto as Exhibit D. GE manufactured and designed the marine steam turbines at issue according to precise, detailed specifications promulgated by Navy Sea Systems Command. *Id.* at ¶ 6. Additionally, an Inspector of Naval Machinery, who had offices on the premises of GE's plants, personally oversaw the manufacturing process and enforced compliance with the Navy design

specifications. *Id.* at ¶¶ 7-19. Further, the turbines were subject to various tests and trials supervised by the Navy before they were approved for use on military vessels. *Id.* at ¶¶ 20-21. Moreover, the Navy, as one of the world's leaders in industrial hygiene state-of-the-art at the time, would have possessed information superior to its equipment suppliers such as GE. In sum, virtually no aspect of the design and manufacture of the marine steam turbines at issue escaped the close control of the Navy and its officers.

15.    This analysis also applies to "failure to warn" cases where "there is evidence that the government was involved in the decision to give, or not to give, a warning." *Kerstetter v. Pacific Scientific Co.,* 210 F.3d 431, 438 (5th Cir.) *cert. denied* 531 U.S. 919 (2000). The Court of Appeals for the Fifth Circuit has made it clear that the government contractor defense is available in "failure to warn" claims where the evidence shows that the lack of a warning reflects governmental direction or control rather than the unfettered discretion of the product's manufacturer, and applies wherever: 1) the government approved or authorized the warnings which the plaintiff contends were inadequate or incomplete; 2) the warnings provided by the manufacturer conformed to the warnings as approved or authorized by the government; and 3) the manufacturer warned the government as to any product hazards known by the manufacturer but unknown by the government. *Kerstetter,* 210 F.3d at 438.

16.    As stressed in *Kerstetter*, "[t]he government need not prepare the specifications to be considered to have approved them." *Id.* at 435. The only material issue is whether the manufacturer's designs and specifications were subjected to "substantial review" rather than a mere "rubber stamp" approval. *Id.* While this determination is necessarily fact specific, "substantial review" has plainly been shown upon evidence of a "'continuous back and forth' between the contractor and the government." *Id.* In this regard, "[t]he specifications need not address the specific defect alleged; the

7

government need only evaluate the design feature in question." *Id.* Once again, applying these general principles to "failure to warn" claims, the fact that governmental specifications or regulations did not specifically preclude the exact warning desired by the plaintiff does not take a "failure to warn" claim outside the scope of the government contractor defense so long as the government was involved generally as to the issue of product warnings (or specifically approved the warnings provided by the contractor) and was generally aware of the hazard in question. *Id.* at 438. Stated another way, "[i]nadequacy [of a warning] is not an issue when it is the government's warning in the first place." *Id.* at 438.

17.    The present case is also substantially similar to *Kerstetter, supra.* As explained by David Hobson for GE:

> [T]he Navy exercised intense direction and control over all written documentation and any safety or caution information that the navy, in its sole discretion, directed be provided with these [GE] turbines.

> The U.S. Navy had precise specifications, practices and procedures that governed the content of any communication affixed to machinery supplied by GE to the Navy. GE would not have been permitted, under the specifications, associated regulations and procedures, and especially under the actual practice as it evolved in the field, to affix any type of warning or caution statement to a piece of equipment intended for installation onto a naval vessel, beyond those required by the Navy.

> [T]he U.S. Navy had precise specifications, practices and procedures as to the nature of written materials to be delivered with its naval turbines, such as engineering drawings, test reports, and other technical data that could be used as needed by shipboard engineering officers during the life of the equipment. Some of the material was typically compiled into a volume that was generically called a "technical manual." The Navy required that every piece of equipment be supplied with a defined number of copies of one or more technical manuals. Navy personnel participated intimately in the preparation of this kind of information and exercised specific direction and control over its contents. These manuals included safety information related to the operation of naval turbines only to the extent directed by the Navy.

> [T]he Navy, not GE, determined the nature of warnings communicated to naval personnel in relation to shipboard equipment and materials.

*See* Additional Affidavit of David Hobson attached hereto as Exhibit C at ¶¶ 2-6.

18.    Similarly, as explained by J. Thomas Schroppe for Foster Wheeler:

> The Navy exercised intense direction and control over all written documentation to
> be delivered with its naval boilers...The Navy required that every piece of equipment
> be supplied with a defined number of copies of one or more technical manuals. Navy
> personnel participated intimately in the preparation of this kind of information and
> exercised specific direction and control over its contents.  These manuals included
> safety information related to the operation of naval boilers only to the extent directed
> by the Navy.
>
> Furthermore, the Navy had precise specifications, practices and procedures that governed the
> content of any communication affixed to machinery supplied by Foster Wheeler to the Navy.
> Foster Wheeler would not be permitted, under the specifications, associated regulations and
> procedures, and especially under actual practice as it evolved in the field, to affix any type of
> warning or caution statement to a piece of equipment intended for installation onto a Navy
> vessel, beyond those required by the Navy.

*See* Affidavit of J. Thomas Schroppe attached hereto as Exhibit D at ¶¶ 21 and 22.

19.    Thus, the presence or absence of warnings regarding defendants' equipment was

strictly controlled by the Navy - and a clear basis for removal exists under § 1442(a)(1).

20.    In further support of the removal, GE provides the Affidavit of Admiral Ben J.

Lehman, U.S. Navy, Ret. *See* Affidavit of Admiral Lehman attached hereto as Exhibit E. Admiral

Lehman joined the Navy in 1942 and worked as Ship Superintendent and Planning Officer at the

Brooklyn Navy Yard between 1942 and 1944, as Ship Superintendent at the San Francisco Naval

Shipyard from 1950 to 1952, and as Planning Officer at the Assistant Industrial Manager Office in

San Francisco from 1952 to 1054. *Id.* at ¶ 1. He also worked as an engineer at GE between 1946

and 1948. *Id.* During his tenure in the Navy and as Ship Superintendent, Admiral Lehman was

personally involved with the supervision and oversight of ship alterations and equipment over hauls

at the Brooklyn Navy Yard. *Id.* at ¶ 3. Admiral Lehman states in his Affidavit the Navy controlled

9

every aspect of the design and manufacture of equipment intended for installation on Navy vessels and that the Navy could not, and did not, permit its contractors to implement changes from military specifications. *Id.* at ¶¶ 2 and 3. He further states that in the 1940s and afterward, the Navy had complete control over every aspect of each piece of equipment including instructions, warnings, drawings, nameplates, texts of instruction manuals and "every other document relating to the construction, maintenance and operation" of equipment of its vessels. *Id.* at ¶ 4.

21.     Moreover, in further support of the removal, Foster Wheeler provides an additional Affidavit of Admiral Lehman. *See* Additional Affidavit of Admiral Lehman attached hereto as Exhibit F. Admiral Lehman states:

> The U.S. Navy would not have allowed its equipment suppliers, such as Foster Wheeler, to affix any warning related to any asbestos hazards on their equipment. This would have included boilers. Further, the U.S. Navy would not have allowed Foster Wheeler to place any warnings related to asbestos hazards in any written material provided by Foster Wheeler to the U.S. Navy or to a U.S. Navy contractor in accordance with its contracts, including its technical and operations manuals. To do so would have interfered with the U.S. Navy's mission and control of its ships and personnel.

*Id.* at ¶ 14.

22.     These facts have been held sufficient to support removal in a similar case. *See Nesbiet v. General Electric Company, et al.*, 04 CV 9321 (S.D.N.Y March 28, 2005) attached hereto as Exhibit G. In fact, in another recent case removed for the same reasons, the Court, in denying plaintiffs' Motion to Remand, noted that "[p]laintiffs concede the obvious—the federal officer removal statute, which has been applied to government contractors, permits a federal contractor defendant to remove a case in which no federal claim is asserted, as long as the defendant intends to assert a defense dependent on federal law (i.e., federal officer immunity, based on the following of government specifications in the manufacture of the asbestos-containing product)." *See Frawley v.*

*General Electric Company, et al.*, 06 CV 15395 (S.D.N.Y. March 1, 2007) at page 3 attached hereto as Exhibit H. Clearly, defendants' Affidavits support federal removal jurisdiction under 28 U.S.C. § 1442(a)(1) and the federal nexus to defendants' actions has been established.

23.    A properly removed case cannot be remanded for discretionary or policy reasons such as allegedly related state court cases or a contention that judicial economy compels remand. 28 U.S.C. § 1447(c); *Thermitron Products, Inc. v. Hermansdorfer*, 423 U.S. 336 (1976). The federal officer removal statute is not narrow or limited, and it should not be frustrated by a narrow or grudging interpretation of § 1442(a)(1). *Willingham v. Morgan*, 395 U.S. 402, 405 (1960).

24.    Defendants are not required to notify and obtain the consent of any other defendant in this action in order to remove plaintiff's action as a whole under § 1442(a)(1). *See Torres v. CBS News*, 854 F.Supp. 245 (S.D.N.Y. 1994)

25.    As required by 28 U.S.C. § 1446(b) and the local rules of this Court, true and correct copies of the process and pleadings served upon defendants are being filed with this Notice of Removal. Please note, however, that no Orders have been entered to date.

## Conclusion

26.    Removal of this action is proper under 28 U.S.C. § 1442, because it is a civil action brought in a state court, and the federal district courts have original jurisdiction over the subject matter under 28 U.S.C. § 1442(a)(1) because defendants were acting under an officer or agency of the United States.

THEREFORE, General Electric Company and Foster Wheeler LLC pursuant to these statutes

and in conformance with the requirements set forth in 28 U.S.C. § 1446, remove this action for trial

from the Supreme Court of the State of New York, County of New York, on this 19th day of June,

2008.

Respectfully submitted,
**Sedgwick, Detert, Moran & Arnold LLP**
**Three Gateway Center, 12th Floor**
**Newark, New Jersey 07102**
**(973) 242-0002**

By: _____
Michael A. Tanenbaum

**ATTORNEYS FOR DEFENDANTS:**
**GENERAL ELECTRIC COMPANY**
**FOSTER WHEELER, LLC**

**cc: Via Hand Delivery**

Joseph Block, Esq.
LEVY PHILLIPS & KONIGSBERG, LLP
800 Third Avenue
New York, New York 10022
(212) 605-6200
ATTORNEYS FOR PLAINTIFF

All Known Defense Counsel (via regular mail)



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

EDWARD JOSEPH HOGAN,

                Plaintiff,

         - against-

AMERICAN STANDARD, INC.;
A.O. SMITH WATER PRODUCTS COMPANY;
AURORA PUMP COMPANY;
A.W. CHESTERTON CO., INC.;
BENJAMIN MOORE & CO.;
BONDEX INTERNATIONAL, INC.;
BUFFALO PUMPS, INC.,
        individually and as a subsidiary of
        AMPCO-PITTSBURGH CORP.;
BURNHAM HOLDINGS, INC.;
        as successor to Burnham Corporation;
CARRIER CORPORATION,
        a/k/a Bryant Manufacturing Corporation;
CERTAINTEED CORPORATION;
C.H. WHEELER MANUFACTURING CO.;
CLEAVER BROOKS COMPANY;
CONSOLIDATED VALVE, LTD.;
CRANE CO.;
CRANE PUMPS & SYSTEMS, INC.;
DIAL CORP.,
        individually and as Successor to Griscom Russell
        Schack Company,Inc.;
DUNHAM-BUSH, INC.;
DURABLA MANUFACTURING COMPANY;
ELLIOTT TURBOMACHINERY CO., INC.;
FAIRBANKS-MORSE PUMP CORPORATION;
FOSTER WHEELER;
GARDNER DENVER, INC.;
GARLOCK SEALING TECHNOLOGIES, LLC,
        successor by merger to GARLOCK, INC.;
GENERAL ELECTRIC COMPANY;
GENERAL REFRACTORIES, CO.;
GEORGIA-PACIFIC CORPORATION;
GOULDS PUMPS INCORPORATED;
HB SMITH COMPANY INCORPORATED;

Index No. 08/107210
DOF: 5/22/08

**SUMMONS**

Plaintiff designates
NEW YORK COUNTY
as the Place for Trial

The basis for venue is
Defendant's place of business

Plaintiff resides at
4108 Platt Spring Road
West Columbia, SC 29170

NEW YORK
COUNTY CLERK'S OFFICE

MAY 22 2008

NOT COMPARED
WITH COPY FILE

00117855.WPD

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

HERCULES CHEMICAL COMPANY, INC.;
HONEYWELL INTERNATIONAL, INC.,
       f/k/a AlliedSignal, Inc., as successor-in-interest
       to The Bendix Corporation;
HOPEMAN BROTHERS, INC.;
IMO INDUSTRIES, INC.,
       as successor-in-interest to and f/k/a Delaval Turbine,
       Transamerica Delaval, IMO Delaval and
       Enterprise Engine & Foundry Co.;
INGERSOLL-RAND COMPANY,
       individually and as successor to Terry Steam Turbine Company;
J.H. FRANCE REFRACTORIES COMPANY;
KAISER GYPSUM COMPANY, INC.;
KENTILE FLOORS, INC.;
KUNKLE INDUSTRIES;
LENNOX INDUSTRIES, INC.;
LESLIE CONTROLS, INC.;
RAPID-AMERICAN CORPORATION,
       as successor-in-interest to Phillip
       Carey Manufacturing Corp.;
RHEEM-MANUFACTURING COMPANY;
TACO, INC.;
THE ANCHOR PACKING CO.;
THE FALK CORPORATION;
TUTHILL ENERGY SYSTEMS, INC.;
TYCO FLOW CONTROL, INC.;
UNION CARBIDE CORP.;
VIACOM INC.,
       successor by merger to CBS Corporation,
       f/k/a Westinghouse Electric Corporation;
WARREN PUMPS;
WEIL McLAIN.
       a division of The Marley Company;
YARWAY CORPORATION;

                             Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

*TO THE ABOVE NAMED DEFENDANTS:*

    ***You are hereby summoned*** to answer in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete is this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:      New York, New York
             May 21, 2008

LEVY PHILLIPS & KONIGSBERG, L.L.P.

By: _____

      Audrey P. Raphael

800 Third Avenue, 13th Floor
New York, NY 10022
(212) 605-6200
Attorneys for Plaintiff

00117855.WPD

-3-

## DEFENDANTS ADDRESSES

AMERICAN STANDARD, INC.
Via Secretary of State
Albany, NY

A.O. SMITH WATER PRODUCTS
COMPANY
11270 West Park Place
Milwaukee, WI 53224

AURORA PUMP COMPANY
c/o Karen Carriker
13515 Ballantyne Corporate Place
Charloote, NC 28277

A.W. CHESTERTON CO., INC.
P.O. Box 4004
Woburn, MA 01888-4004

BENJAMIN MOORE & CO.
Via Secretary of State
Albany, New York

BONDEX INTERNATIONAL, INC.
Legal Department
707 Spirit 40 Park Drive, Suite 130
Chesterfield, MI 63005

BUFFALO PUMPS, INC.
c/o CT Corporation System
111 Eighth Avenue
New York, NY 10011

BURNHAM HOLDINGS, INC.
Via Secretary of State
Albany, NY

CARRIER CORPORATION
Via Secretary of State
Albany, NY

CERTAINTEED CORPORATION
750 East Swedes Ford Road
P.O. Box 860
Valley Forge, PA 19482

C.H. WHEELER MANUFACTURING CO.
Via Secretary of State
Albany, NY

CLEAVER-BROOKS INC.
c/o Ronald Thimm, Aqua-Chem, Inc.
7800 N. 113th Street
P.O. Box 421
Milwaukee, WI 53201

CONSOLIDATED VALVE, LTD.
105 East Fourth Street, Suite 300
Cincinnati, OH 45202

CRANE CO.
c/o C.T. Corporation System
111 Eighth Avenue
New York, NY 10011

CRANE PUMPS & SYSTEMS, INC.
c/o C.T. Corporation System
111 Eighth Avenue
New York, NY 10011

DIAL CORP.
Via Secretary of State
Albany, NY

00117855.WPD

-4-

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

DURABLA MANUFACTURING
COMPANY
c/o Clemente Mueller
218 Ridgedale Avenue - P.O. Box 1296
Morristown, New Jersey 07962-1296

ELLIOTT TURBOMACHINERY CO.,
INC.
North 4th Street
Jeannette, PA 15644

FAIRBANKS MORSE PUMP CORP.
Via Secretary of State
Albany, NY

FORT KENT HOLDINGS, INC.
f/k/a Dunham-Bush, Inc.
c/o Peter Langenus, Esq.
Schnader, Harrison, Segal & Lewis
140 Broadway, Suite 3100
New York, NY 10005

FOSTER WHEELER
Perryville Corporate Park
P.O. Box 4000
Clinton, NJ 08809

GARDNER DENVER, INC.
Via Secretary of State
Albany, NY

GARLOCK SEALING TECHNOLOGIES,
LLC
c/o CT Corporation System
111 Eighth Avenue
New York, NY 10011

GENERAL ELECTRIC COMPANY
c/o Henry J. King, Jr., Esq.
Managing Attorney
Electric Insurance Company
152 Conant Street
Beverly, MA 01915

GEORGIA-PACIFIC CORPORATION
133 Peachtree Street, N.E.
Atlanta, GA 30303

GENERAL REFRACTORIES CO.
225 City Avenue, Suite 114
Bala Cynwyd, PA 19004

GOULDS PUMPS INCORPORATED
Via Secretary of State
Albany, NY

HB SMITH COMPANY INCORPORATED
c/o Peter Stasz, Esq.
47 Westfield Industrial Park
Westfield, MA 01085

HERCULES CHEMICAL COMPANY,
INC.
111 South Street
Passaic, NJ 07055

HONEYWELL INTERNATIONAL, INC.
101 Columbia Road
Morristown, NJ 07962-1057

HOPEMAN BROTHERS, INC.
Via Secretary of State
Albany, NY

IMO INDUSTRIES, INC.
Via Secretary of State
Albany, NY

00117855.WPD

-5-

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

INGERSOLL-RAND COMPANY
200 Chestnut Ridge Road
Woodcliff Lake, New Jersey 07675

J.H. FRANCE REFRACTORIES CO.
P.O. Box 276
895 Clarence Road
Snow Shoe, PA 16874-0276

KAISER GYPSUM COMPANY, INC.
Via Secretary of State
Albany, NY

KENTILE FLOORS, INC.
c/o G&K Consultants, Inc.
4 Rita Street
Syosset, NY 11791

KUNKLE INDUSTRIES
Via Secretary of State
Albany, NY

LENNOX INDUSTRIES, INC.
Via Secretary of State
Albany, NY

LESLIE CONTROLS, INC.
12501 Telecom Drive
Tampa, FL 33637

RAPID-AMERICAN CORPORATION
The Prentice Hall Corporation
c/o Corporation Service Company
2711 Centerville Road
Wilmington, DE 19808

RHEEM-MANUFACTURING COMPANY
1100 Abernathy Road, Suite 1400
Atlanta, GA 30328

TACO, INC.
1160 Cranston Street
Cranston, RI 02920

THE ANCHOR PACKING COMPANY
c/o Giller-Garrison
1 Marine Midland Plz
Ste. 1830
Rochester, NY 14604-2420

THE FALK CORPORATION
Via Secretary of State
Albany, NY

TUTHILL ENERGY SYSTEMS, INC.
Via Secretary of State
Albany, NY

TYCO FLOW CONTROL, INC.
9 Roszel Road
Princeton, NJ 08540

UNION CARBIDE
c/o CT Corporation
111 Eighth Avenue
New York, NY 10011

VIACOM, INC.
c/o Asbestos Litigation Support Manager
Eckert Seamans Cherin & Mellott, LLC
Case Management & Technology Center
600 Grant Street, 5th Floor
Pittsburgh, PA 15219

00117855.WPD                                    -6-

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

WARREN PUMPS, INC.
82 Bridges Avenue
P.O. Box 969
Warren, MA 01083-0969

YARWAY CORPORATION
2405 Maryland Road
Willow Grove, PA 19090

WEIL McLAIN
500 Blaine Street
Michigan City, IN 46360-2388

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

EDWARD JOSEPH HOGAN,

                    Plaintiff,

       - against-

AMERICAN STANDARD, INC.;
A.O. SMITH WATER PRODUCTS COMPANY;
AURORA PUMP COMPANY;
A.W. CHESTERTON CO., INC.;
BENJAMIN MOORE & CO.;
BONDEX INTERNATIONAL, INC.;
BUFFALO PUMPS, INC.,
      individually and as a subsidiary of
      AMPCO-PITTSBURGH CORP.;
BURNHAM HOLDINGS, INC.;
      as successor to Burnham Corporation;
CARRIER CORPORATION,
      a/k/a Bryant Manufacturing Corporation;
CERTAINTEED CORPORATION;
C.H. WHEELER MANUFACTURING CO.;
CLEAVER BROOKS COMPANY;
CONSOLIDATED VALVE, LTD.;
CRANE CO.;
CRANE PUMPS & SYSTEMS, INC.;
DIAL CORP.,
      individually and as Successor to Griscom Russell
      Schack Company,Inc.;
DUNHAM-BUSH, INC.;
DURABLA MANUFACTURING COMPANY;
ELLIOTT TURBOMACHINERY CO., INC.;
FAIRBANKS-MORSE PUMP CORPORATION;
FOSTER WHEELER;
GARDNER DENVER, INC.;
GARLOCK SEALING TECHNOLOGIES, LLC,
      successor by merger to GARLOCK, INC.;
GENERAL ELECTRIC COMPANY;
GENERAL REFRACTORIES, CO.;
GEORGIA-PACIFIC CORPORATION;
GOULDS PUMPS INCORPORATED;
HB SMITH COMPANY INCORPORATED;

Index No.
DOF: 5/22/08

**COMPLAINT**

Plaintiff Demands
a Trial by Jury

LEVY PHILLIPS &
KONIGSBERG, L.L.P.
800 THIRD AVENUE
NEW YORK, N.Y. 10022

HERCULES CHEMICAL COMPANY, INC.;
HONEYWELL INTERNATIONAL, INC.,
     f/k/a AlliedSignal, Inc., as successor-in-interest
     to The Bendix Corporation;
HOPEMAN BROTHERS, INC.;
IMO INDUSTRIES, INC.,
     as successor-in-interest to and f/k/a Delaval Turbine,
     Transamerica Delaval, IMO Delaval and
     Enterprise Engine & Foundry Co.;
INGERSOLL-RAND COMPANY,
     individually and as successor to Terry Steam Turbine Company;
J.H. FRANCE REFRACTORIES COMPANY;
KAISER GYPSUM COMPANY, INC.;
KENTILE FLOORS, INC.;
KUNKLE INDUSTRIES;
LENNOX INDUSTRIES, INC.;
LESLIE CONTROLS, INC.;
RAPID-AMERICAN CORPORATION,
     as successor-in-interest to Phillip
     Carey Manufacturing Corp.;
RHEEM-MANUFACTURING COMPANY;
TACO, INC.;
THE ANCHOR PACKING CO.;
THE FALK CORPORATION;
TUTHILL ENERGY SYSTEMS, INC.;
TYCO FLOW CONTROL, INC.;
UNION CARBIDE CORP.;
VIACOM INC.,
     successor by merger to CBS Corporation,
     f/k/a Westinghouse Electric Corporation;
WARREN PUMPS;
WEIL McLAIN.
     a division of The Marley Company;
YARWAY CORPORATION;
                           Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

*TO THE ABOVE NAMED DEFENDANTS:*

     Plaintiff, by his attorneys, LEVY PHILLIPS & KONIGSBERG, LLP, for his Complaint,

respectfully alleges as follows:

     1.     Plaintiff repeats and re-alleges New York Asbestos Litigation Standard Complaint

          No. 1 as if fully incorporated herein.

1  DAVID R. DONADIO, ESQ., S.B. #154436
   NANCY T. WILLIAMS, ESQ., S.B. #201095
2  JAMES F. NEVIN, ESQ., S.B. #220816
   BRAYTON❖PURCELL
3  Attorneys at Law
   222 Rush Landing Road
4  P.O. Box 6169Novato, California  94948-6169
   (415) 898-1555
5  (415) 898-1247 (Fax No.)

6  Attorneys for Plaintiffs

7

8              SUPERIOR COURT OF CALIFORNIA

9              COUNTY OF SAN FRANCISCO

10

11 IN RE: ASBESTOS CASES OF            )  No.    828684
   BRAYTON ❖PURCELL                    )
12                                     )  © BRAYTON ❖PURCELL MASTER
   v.                                  )  COMPLAINT FOR PERSONAL INJURY
13                                     )  [AND LOSS OF CONSORTIUM] -
   ASBESTOS DEFENDANTS (BP).           )  ASBESTOS
14

15

16         As used herein, "Plaintiff-1" shall mean the asbestos-injured plaintiff (hereinafter referred

17 to as "plaintiff" or "Plaintiff-1"); "Plaintiff-2" shall mean the spouse or legally significant other

18 partner (as defined by statute as having standing, see e.g. California Family Code § 297, et seq.;

19 California Code of Civil Procedure § 377, et seq.) of Plaintiff-1 (hereinafter included as

20 appropriate in the term "plaintiff").

21         As used herein, the masculine gender shall be deemed to include the feminine gender

22 whenever the asbestos-injured plaintiff is a female.

23         1.     The true names and capacities, whether individual, corporate, associate,

24 governmental, or otherwise, of defendants DOES 1 through 8,500, are unknown to plaintiff at

25 this time, who therefore sues said defendants by such fictitious names.  When the true names and

26 capacities of said defendants have been ascertained, plaintiff will amend this complaint

27 accordingly.  Plaintiff is informed and believes, and thereon alleges, that each defendant

28 designated herein as a DOE is responsible, negligently or in some other actionable manner, for

EI···RSED
FILED
SAN FRANCISCO COUNTY
SUPERIOR COURT

2003 JAN -2  PM 4: 02

GORDON PARK - CI CLERK

BY: Nicole Olcomerdy Adam
        DEPUTY CLERK

2.    Plaintiff is a citizen of the State of South Carolina.

3.    Plaintiff, Edward Joseph Hogan has been diagnosed with Lung Cancer and meets the

minimum requirement for activation into the active docket pursuant to the Case

Management Order governing these actions.

Dated:    New York, New York
          May 21, 2008

                    LEVY PHILLIPS & KONIGSBERG, L.L.P.


                    By:    Audrey P. Raphael

                    800 Third Avenue, 13th Floor
                    New York, NY 10022
                    (212) 605-6200
                    *Attorneys for Plaintiff*







7007 0710 0002 0786 7583

*Law Offices*
LEVY PHILLIPS & KONIGSBERG, LLP
800 THIRD AVENUE
NEW YORK, N.Y. 10022

FOSTER WHEELER
Perryville Corporate Park
P.O. Box 4000
Clinton, NJ 08809

00118719.WPD
00098479.WPD

#6/6/08
#100113∅

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
————————————————————————X

EDWARD JOSEPH HOGAN,

           **Plaintiff,**

    - against -

AMERICAN STANDARD, INC.., et al.,,
              **Defendants.**
————————————————————————X

**STATEMENT OF SERVICE BY MAIL AND
ACKNOWLEDGMENT OF RECEIPT BY
MAIL OF SUMMONS AND COMPLAINT**

INDEX NO. 08/107210
DOF: 5/22/08

FOSTER WHEELER
Perryville Corporate Park
P.O. Box 4000
Clinton, NJ 08809

    The enclosed Summons and Complaint are served pursuant to § 312-a of the Civil Practice Law and Rules.

    To avoid being charged with the expense of service upon you, you must sign, date and complete the Acknowledgment part of this form and mail or deliver one copy of the completed form to the sender within thirty (30) days from the date you receive it. You should keep a copy for your records or your attorney. If you wish to consult an attorney, you should do so as soon as possible before the thirty (30) days expire.

    If you do not complete and return the form to the sender within thirty (30) days, you (or the party on whose behalf you are being served) will be required to pay any expenses incurred in serving a summons and complaint in any other manner permitted by law, and the cost of such service as permitted by law will be entered as a judgment against you.

    If you have received a Complaint with this statement, the return of this statement and Acknowledgment does not relieve you of the necessity to answer the Complaint. The time to answer expires twenty (20) days after the day you mail or deliver this form to the sender. If you wish to consult an attorney, you should do so as soon as possible before the twenty (20) days expire.

    If you are served on behalf of a corporation, unincorporated association, partnership or other entity, you must indicate under your signature your relationship to the entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

    It is a crime to forge a signature or to make a false entry on this statement or on the Acknowledgment.

    I declare, under penalty of perjury, that this Statement of Service by Mail and Acknowledge of Receipt by Mail of Summons and Complaint will have been mailed on May 30, 2008.

_Marjorie Milana_
Signature

                        _May 30, 2008_
                        Date of Signature

Levy Phillips & Konigsberg, 800 Third Avenue, New York, New York 10022
Address

## ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

I received a Summons and Complaint in the above captioned matter at [INSERT ADDRESS] _Perryville_
_Corporate Park, Clinton, N.J. 08809-4000._

PLEASE CHECK ONE OF THE FOLLOWING:

               IF 2 IS CHECKED, COMPLETE AS INDICATED

    1. ☑    I am not in the military service.

    2. ☐    I am in military service and my rank, serial number and branch of service are as follows:

Rank:_____        Branch of Service:_____

Serial Number:_____

Date: _06/03/08_    TO BE COMPLETED REGARDLESS OF MILIARY STATUS:
    (Date this Acknowledgment is executed)

I affirm the above as true under penalty of perjury.

_Fred C. Wolsky_
Signature

_Frederick C. Wolsky, Asst. Gen. Counsel,_
Print Name

_Foster Wheeler Inc., on behalf of_
Name of Defendant for which acting

_Foster Wheeler LLC, survivor to_
Position with Defendant for which acting (i.e. officer, attorney, etc.)

**Please Complete All Blanks Including Dates** _a merger with Foster Wheeler Corpor_

00118705.WPD

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
————————————————————————X

EDWARD JOSEPH HOGAN,

          Plaintiff,

    - against -

AMERICAN STANDARD, INC.., et al.,,
          Defendants.
————————————————————————X

**STATEMENT OF SERVICE BY MAIL AND
ACKNOWLEDGMENT OF RECEIPT BY
MAIL OF SUMMONS AND COMPLAINT**

INDEX NO. 08/107210
DOF: 5/22/08

FOSTER WHEELER
Perryville Corporate Park
P.O. Box 4000
Clinton, NJ 08809

    The enclosed Summons and Complaint are served pursuant to § 312-a of the Civil Practice Law and Rules.

    To avoid being charged with the expense of service upon you, you must sign, date and complete the Acknowledgment part of this form and mail or deliver one copy of the completed form to the sender within thirty (30) days from the date you receive it. You should keep a copy for your records or your attorney. If you wish to consult an attorney, you should do so as soon as possible before the thirty (30) days expire.

    If you do not complete and return the form to the sender within thirty (30) days, you (or the party on whose behalf you are being served) will be required to pay any expenses incurred in serving a summons and complaint in any other manner permitted by law, and the cost of such service as permitted by law will be entered as a judgment against you.

    If you have received a Complaint with this statement, the return of this statement and Acknowledgment does not relieve you of the necessity to answer the Complaint. The time to answer expires twenty (20) days after the day you mail or deliver this form to the sender. If you wish to consult an attorney, you should do so as soon as possible before the twenty (20) days expire.

    If you are served on behalf of a corporation, unincorporated association, partnership or other entity, you must indicate under your signature your relationship to the entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

    It is a crime to forge a signature or to make a false entry on this statement or on the Acknowledgment.

    I declare, under penalty of perjury, that this Statement of Service by Mail and Acknowledge of Receipt by Mail of Summons and Complaint will have been mailed on May 30, 2008.

_Marjorie Milano_ _____
Signature

May 30, 2008 _____
Date of Signature

Levy Phillips & Konigsberg, 800 Third Avenue, New York, New York  10022 _____
Address

**ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT**

I received a Summons and Complaint in the above-captioned matter at [INSERT ADDRESS]_____
_____

PLEASE CHECK ONE OF THE FOLLOWING;
        IF 2 IS CHECKED, COMPLETE AS INDICATED
      1. ☐        I am not in the military service.
      2. ☐        I am in military service and my rank, serial number and branch of service are as follows:
Rank:_____    Branch of Service:_____

Serial Number:_____

                TO BE COMPLETED REGARDLESS OF MILIARY STATUS:
Date: _____
      (Date this Acknowledgment is executed)

    I affirm the above as true under penalty of perjury.

                  _____
                  Signature

                  _____
                  Print Name

                  _____
                    Name of Defendant for which acting

                  _____
                    Position with Defendant for which acting (i.e., officer, attorney, etc.)
                  **Please Complete All Blanks Including Dates**

00118705.WPD



LEVY, PHILLIPS & KONIGSBERG, LLP
ATTORNEYS AT LAW
800 THIRD AVENUE
NEW YORK, N. Y. 10022

(212) 605-6200
FAX: (212) 605-6290
E-MAIL: lpk@lpklaw.com

Writer's Direct E-Mail cdonaldson@lpklaw.com

NEW JERSEY OFFICE
QUAKERBRIDGE EXECUTIVE CENTER
101 GROVERS MILL ROAD
LAWRENCEVILLE, NJ 08648
TELEPHONE: (609) 720-0400
FAX: (609) 720-0457

GOSHEN OFFICE
42 PARK PLACE
GOSHEN, NEW YORK 10924
TELEPHONE: (845) 294-2002

May 28, 2008

**VIA FIRST CLASS MAIL**

To:    All Counsel

**Re: Edward Hogan**
**November 2008 Extremis Trial Cluster**

Dear Counsel:

Enclosed please find Plaintiffs' Answers To Defendants' Fourth Amended Standard Set Of Interrogatories And Request For Production Of Documents for Edward Hogan, along with a copy of his medical reports from Dr. Paul Kirschenfeld and Lexington Medical Center diagnosing his lung cancer.

Very truly yours,

LEVY PHILLIPS & KONIGSBERG, LLP

By: Corrinne Donaldson
*Legal Assistant*

:cd
Enclosure

00118399.WPD

SUPREME COURT OF THE STATE OF NEW YORK
ALL COUNTIES WITHIN NEW YORK CITY
------------------------------------------------------------X
In Re:        NEW YORK CITY                    NYCAL
              ASBESTOS LITIGATION
------------------------------------------------------------X
This Document Applies to:                      **PLAINTIFF'S ANSWERS TO
                                               DEFENDANTS' FOURTH
                                               AMENDED STANDARD SET OF
EDWARD HOGAN    Index No.:08/106649            INTERROGATORIES AND
                                               REQUEST FOR PRODUCTION
                                               OF DOCUMENTS**
------------------------------------------------------------X

00118098.WPD

**GENERAL OBJECTION**

Plaintiff objects to these discovery requests to the extent they seek information protected as attorney-client privilege and/or work product doctrine. Finally, plaintiff objects to any discovery request that may be construed as requesting production of Proof of Claim Forms (POCs) and/or other documents reflecting communications between plaintiff and any settlement trust or any other entity made solely for purposes of settlement. See CPLR § 4547.

## INTERROGATORIES

1.    State the following:

    (a)    your full name, and all other names by which you have been known;

    (b)    age, and date and place of birth;

    (c)    whether you were an adopted child;

    (d)    present marital status, date of current marriage, spouse's maiden name,

        dates of any prior marriages and the names of any prior spouses, if

        applicable;

    (e)    present home address; and

    (f)    social security number.

A.1.    (a)    Edward J. Hogan (Ed).

    (b)    86; May 22, 1922; Greenwich Village, NY.

    (c)    Natural.

    (d)    Widower.

    (e)    4108 Platt Springs Road, West Columbia, SC 29170.

    (f)    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.

2.    State the following with regard to your father and mother:

    (a)    names;

    (b)    current address (if deceased, state last known address);

    (c)    the current condition of each one's health, including any specific medical

problems.  If either of your parents are deceased, please state for each deceased parent:

      i.     specific physical problems;

      ii.    date and place of death;

      iii.   age and cause of death for each parent.

A.2.   (a)   Mother: Mary Hogan       Father: Claude Hogan.

      (b)   Mother: Deceased; Fresh Meadows, NY.

            Father: Deceased; Fresh Meadows, NY.

      (c)   Mother: Deceased.   Father: Deceased.

         (i)   Mother: None.    Father: None.

         (ii)  Mother: 4/25/1971; Paramus NJ.

             Father: 4/23/1963; Fresh Meadows, NY.

         (iii) Mother: 84; Diabetse.

             Father: 74; complications of the heart.

3.   State the following with regard to each of your children:

   (a)   full name;

   (b)   the date of birth;

   (c)   sex;

   (d)   current address (if deceased, state the last known address);

   (e)   social security number;

   (f)   whether birth child or adopted child;

    (g)    current state of each one's health.  If any of your children are deceased,

state for each deceased child:

    I.    specific physical problems;

    ii.    date and place of death; and

    iii.    age and cause of death for each child.

A.3.I.  (a)    Linda Zember.

    (b)    August 23, 1948.

    (c)    Female.

    (d)    4108 Platt Springs, W. Columbia, SC 29170.

    (e)    To be provided.

    (f)    Birth.

    (g)    Good.

A.3.II.(a)    Bonnie Mikulski.

    (b)    May 7, 1951.

    (c)    Female.

    (d)    1111 Lindbergh, Feasterville, PA, 19053.

    (e)    To be provided.

    (f)    Birth.

    (g)    Fair.

4.    State the complete address of all places you have resided since birth giving the inclusive dates of residence for each place named and as to each state:

    (a)    fuel use for heating and cooking;

    (b)    significant home improvements (e.g., additions, reinsulation, re-wiring, etc.);

    (c)    number of family units co-occupying said structure.

A.4.I.    2042 Washington Avenue, Bronx, NY.

    Approximately 1922 to 1942.

    (a)    Heating: kerosene        Cooking: gas.

    (b)    None.

    (c)    Three family home.

A.4.II.    200 Harrison Avenue, Bethpage, NY.

    Approximately 1943 to 1947.

    (a)    Heating: electric      Cooking: electric.

    (b)    None.

    (c)    Two family home.

A.4.III.    Division Avenue, Levittown, NY.

    Approximately 1948 to 1949.

    (a)    Heating: oil      Cooking: electric.

    (b)    None.

(c)     Single family home.

A.4.IV.     33 Silver Birch Lane, Levittown, NY.

Approximately 1950 to 1960.

(a)     Heating: oil          Cooking: electric.

(b)     None.

(c)     Single family home.

A.4.V.     192 Rockville Road, Holland, PA.

Approximately 1961 to 1969.

(a)     Heating: radiant hot water     Cooking: electric.

(b)     None.

(c)     Single family home.

A.4.VI.     326 N. Atlantic Avenue, Daytona Beach, FL

Approximately 1969 to 1975.

(a)     Heating: electric     Cooking: electric.

(b)     None.

(c)     Motel (16 units).

A.4.VII.     Newman Drive, S. Daytona Beach, FL.

Approximately 1976 to 1982.

(a)     Heating: Electric     Cooking: electric.

(b)     None.

   (c)  Single family home.

A.4.VIII.  11 Primrose Lane, Spartanburg, SC.

   Approximately 1983 to 1987.

   (a)  Heating: electric  Cooking: Electric.

   (b)  None.

   (c)  Single family home.

A.4.IX.  Leeward Road, Lake Murray Cola, SC.

   Approximately 1988 to 1991.

   (a)  Heating: electric hot water  Cooking: electric.

   (b)  None.

   (c)  4 family home.

A.4.X.  157 Charlie Rast Road, Swansea, SC.

   Approximately 1992 to 1998.

   (a)  Heating: electric hot water  Cooking: electric.

   (b)  None.

   (c)  Single family home.

A.4.XI  4108 Platt Springs Road, W. Columbia, SC.

   Approximately 1999 to present.

   (a)  Heating: electric hot water  Cooking: electric.

   (b)  None.

(c)    Single family home.

5.    For every physician or other health care provider who ever tested, treated, consulted with or examined you up to and including the present date, for any reason whatsoever, please state the following separately as to each:

(a)    name and address of physician or health care provider and, if ongoing, the approximate frequency of said treatment and services;

(b)    date(s) of test, examination and/or treatment;

(c)    symptoms complained of at the time, if any;

(d)    any diagnosis made;

(e)    treatment or examination given and reason for treatment or examination; and

(f)    any drugs or medications prescribed.

A.5.    At the present time, although it is possible that plaintiff consulted other doctors, nurses and health care providers, plaintiff recalls the following names, dates and treatments:

A.5.I.    (a)    Dr. Jennifer Feldman, Cardiologist.

Lexington Heart Clinic,

120 W. Hospital Drive, West Columbia, SC 29169.

(b)    Approximately April 2007 to present.

(c)     See medical records.

(d)     See  medical records.

(e)     See medical records.

(f)     See medical records.

A.5.II.  (a)     Dr.  Paul Kirschenfeld, Pulmonologist.

Carolina Pulmonary & Critical, PA.

1333 Taylor Street, Suite 6F, Columbia, SC 29201

(b)     Approximately October 2007 to present.

(c)     See medical records.

(d)     Lung Cancer; see  medical records.

(e)     See medical records.

(f)     See medical records.

A.5.III.  (a)     Dr.  Keith Fox, Dermatologist.

Palmetto Dermatology, PA

105 W. Hospital Drive, W. Columbia, SC 29169.

(b)     Approximately  2007 to present.

(c)     See medical records.

(d)     See  medical records.

(e)     See medical records.

(f)     See medical records.

6.      For every hospital, clinic or health care institution in which you have ever been admitted, treated, tested, or examined, whether as an "in-patient" or as an "out-patient," please state the following for each such visit:

    (a)      name and address of the facility;

    (b)      dates and description of test, treatment, examination or hospitalization and, if ongoing, the approximate frequency of said treatment and services; and

    (c)      reason for visit to the facility.

A.6.    At the present time, although it is possible that plaintiff may have been treated or examined in other hospitals and health institutions, plaintiff recalls the following:

A.6.I.    (a)    Lexington Medical Center.

            2720 Sunset Blvd. West Columbia, SC 29169.

    (b)    Approximately  2007 to present.

    (c)    See medical records.

A.6.II.    (a)    Health South Rehabilitation Hospital.

            2935 Colonial Drive, Columbia, SC. 29203.

    (b)    Approximately 2007 to present.

    (c)    See medical records.

A.6.III.    (a)    Providence Hospital

2435 Forest Dr., Columbia, SC. 29204.

    (b)      Approximately 2000.

    (c)      See medical records.

7.    State each of your asbestos-related injuries and/or diseases, describe the nature of those symptoms that you contend are related to your asbestos-related condition(s), and state the date when you first experienced each such symptom and the date of diagnosis and the name of any diagnosing physician and, if different, indicate the date you first became aware of the diagnosis.

A.7.    Plaintiff has sustained a number of asbestos-related injuries, including, but not limited to lung cancer, pain and suffering, mental and emotional distress, shortness of breath, coughing, weight loss, nausea, loss of appetite, difficulty breathing, severe pain, fatigue, respiratory discomfort and pain, and related sequelae. As indicated in plaintiff's medical records, at various and numerous times, plaintiff has experienced a variety of different and differing symptoms related to his injuries, which are numerous and frequent. At this time, plaintiff is unable to state the precise date of the various symptoms might have first occurred. See medical records for date of diagnosis and name of diagnosing physician.

8.    Describe any pain, incapacity, inability to lead a normal life, inability to work, or disability (including retirement) alleged to have resulted from your medical conditions,

including the date and basis therefore.

A.8.    Plaintiff has experienced shortness of breath, coughing, weight loss, loss of
appetite, severe pain, respiratory discomfort and pain, difficulty breathing, and fatigue,
among other things.  Plaintiff's asbestos-related condition has totally disrupted his life,
totally limited him in his everyday activities, interfered with his living a normal life,
caused him fear, emotional distress, pain, suffering, discomfort and inconvenience.  His
ability to do any tasks that require any physical exertion has been extensively diminished.

9.    Have you ever had any biopsies or tissue samples taken?  If so, please state for
each such procedure:

      (a)    the name of the physician performing such procedure;

      (b)    the address where such procedure was performed;

      (c)    the date when such procedure was performed; and

      (d)    the results, conclusions, and/or diagnosis arising from such procedure.

A.9.I.  No.

10.    Have you ever had any chest x-rays, CT Scans and/or pulmonary function tests?
If so, state:

      (a)    the dates and places;

      (b)    the reasons;

    (c)     the results and/or diagnosis resulting therefrom;

    (d)     the location of all chest X-ray films and CT Scans; and

    (e)     provide appropriate authorization to obtain all X-rays, CT Scans and

           pulmonary function tests.

A.10.I.    (a)     Plaintiff has had x-rays taken at Lexington Medical Center but medical

    records may or may not reflect others.

    (b)     See medical records.

    (c)     See medical records.

    (d)     Chest x-ray films and CT Scans should be in the possession of the

           respective doctors and hospitals.

    (e)     Authorizations have been provided to RecordTrak.

11.    Have you ever been exposed to, used, inhaled or ingested any of the following

substances on a regular basis or at work.  If so, state the date(s), place(s), and

circumstances thereof.

    (a)     acids

    (b)     aluminum

    (c)     arsenic

    (d)     barium

    (e)     beryllium

    (f)     butanol

00118098.WPD

(g)    cadmium

(h)    carborundum

(i)    chloroethylene

(j)    chlorine

(k)    chromate

(l)    chromite

(m)    chromium

(n)    coal dust (coal)

(o)    coal tar

(p)    cotton dust

(q)    epoxy

(r)    ethanol

(s)    grinding dust

(t)    iron

(u)    isocyanates

(v)    isopropanol

(w)    lead

(x)    live chickens

(y)    manganese

(z)    nickel

(aa)   nitrogen dioxide

(ab)   nuclear radiation

(ac)    ozone

(ad)    petroleum distillates

(ae)    phosgene

(af)    radiation

(ag)    silica

(ah)    titanium

(ai)    toluene

(aj)    welding smoke or fumes

(ak)    zylene

(al)    zinc.

A.11.   Plaintiff does not recall being exposed to the above substances.

12.     Do you use or have you ever used cigarettes, cigars, pipes, smokeless tobacco, or

any other tobacco substance, from birth to the present time?  If so, state the following:

    (a)    the brand and type of tobacco product(s) used (e.g., filter, non-filter,

        chewing tobacco);

    (b)    the dates during which you used each such product;

    (c)    the amount of the product used per day, during each period of time (e.g., 2

        packs of cigarettes per day);

    (d)    whether you have ever been told by a physician that you are or were

        suffering from any disease or illness caused by or contributed to by

        tobacco; and

(e)     whether you were ever advised by any physician or any other person that use of tobacco products could adversely affect your health and whether you were ever advised to stop using tobacco products, and if so, identify each physician or person who gave you any such advice, the dates on which the advice was given, and state exactly what, if anything, you did in response to that advice.

A.12.I.     Yes.

(a)     Various brands including Sensation and Marlboro non-filtered cigarettes.

(b)     1939 - 1972.

(c)     Approximately 1 to 1½ packs per day.

(d)     No.

(e)     No.

13.     For each spouse and member of your household, from your birth to the present time, state whether they use or have ever used cigarettes, cigars, pipes, smokeless tobacco, or any other tobacco substance, and if so, state the following:

(a)     the brand and type of tobacco product(s) used (e.g., filter, non-filter, chewing tobacco); and

(b)     the dates during which they used each such product.

A.13.I.     Not applicable.

14.     Do you presently consume or have you in the past consumed alcoholic beverages.

If so, state the following:

    (a)    the type of alcoholic beverages consumed;

    (b)    the dates during which you consumed each such alcoholic beverage;

    (c)    the amount of such beverage you consumed each day; and

    (d)    whether you have ever been treated for any illness or disease related to your consumption of alcoholic beverages.

A.14.  Plaintiff in the past drank beer or wine socially on occasion but never on a regular basis.

15.    Have you ever been a member of the Armed Forces of the United States?  If so, state the following:

    (a)    the branch of the service, serial number, and highest rank held;

    (b)    the beginning and ending dates of your military service;

    (c)    the type of discharge that you received; and

    (d)    whether you sustained any injuries or incurred any illness during military service.

    (e)    if you received a medical discharge, attach a copy hereto and set forth the medical reasons.

A. 15.I.  Yes.

    (a)    United States Navy; Service No. 6465339; Seaman.

    (b)    1942 - 1945.

    (c)    Honorable.

(d)     No.

(e)     No.

16.     As to each and every employer (including military service) you have had from the time you were first employed to the present, set forth the following:

(Use attached Chart A)

Include on the Chart all employers where you have worked, and all job sites, regardless of whether or not you believe you were exposed to asbestos during the employment.  Also, include the source of any product identification information provided on Chart A.

A. 16.  See Chart A.

17.     Please state the following with respect to each asbestos-containing product identified on Chart A:

(a)     the color, dimensions, shape, form, texture, weight, appearance and flexibility of each product;

(b)     the appearance of the package or container indicating the manner of packaging, size, dimensions, color and weight; and

(c)     the name, logo, label, numerical and alphabetical markings and other markings or words including warnings on the product and package or container.

A. 17.  (a)     The asbestos-containing products identified in Chart A were varied in

color, dimension, shape, form, texture, weight, appearance and/or

flexibility. Further information may be provided in response to questioning

at deposition.

(b)     To the extent that the asbestos-containing products identified in Chart A

came packaged, such packaging varied in appearance, size, dimension,

color and/or weight. Further information may be provided in response to

questioning at deposition.

(c)     To the extent that the asbestos-containing products identified in Chart A

came packaged, such packaging may have contained various markings

including the manufacturer or trade name of the product. In addition, the

product itself may have also contained various markings. Plaintiff never

personally observed any warnings about asbestos on product packaging or

on the asbestos-containing products themselves.  Further information may

be provided in response to questioning at deposition.


18.    If you have retired from your employment, set forth the following:

(a)     whether said retirement was voluntary or involuntary;

(b)     the effective date of said retirement;

(c)     the name of your employer at the time of retirement;

(d)     the reason for your retirement;

(e)     whether your retirement was related to any claimed asbestos-related injury;

and

(f)    the amount of pension and/or retirement benefits you are receiving or entitled to receive.

A.18.I. Yes.

(a)    Voluntary.

(b)    1986.

(c)    Self-Employed.

(d)    Retirement age.

(e)    No.

(f)    To be provided.

19.    State whether you were exposed (either directly, through a co-worker or otherwise), to any Bankrupt Entity's asbestos-containing materials, or products either mined or manufactured, sold, or distributed by a Bankrupt Entity. If so, state the following:

(a)    As to each and every employer (including military service) you have had from the time you were first employed to the present, set forth the following, concerning Bankrupt Entities' products only:

    i.    Name of Employer;

    ii.    Dates of employment;

    iii.    Asbestos-related job site and address where Bankrupt Entity's products were being used;

    iv.    Dates you were at the job site;

     v.     Job duties at the particular job site;

     vi.     Bankrupt Entity's asbestos-containing materials or products to which you were exposed.

     vii.     Other companies using Bankrupt Entity's asbestos-containing materials or products at the jobsite; and

     viii.     Whether you received any warnings with respect to the use of said product and the nature of those warnings.

(b)     If you were exposed to, used, ingested or inhaled any Bankrupt Entity's Asbestos-Containing Products at any time other than in the scope of your employment, state for each such exposure:

     i.     the date, location and circumstances; and

     ii.     the type of product and the name of the manufacturer, distributor, and miner.

A.19.     Subject to the foregoing general objection, plaintiff responds as follows: See plaintiff's attached "Chart A"

20.     If you were exposed to, used, ingested or inhaled asbestos or asbestos-containing products at any time other than in the scope of your employment, state for each such exposure:

(a)     the date, location and circumstances; and

(b)     the type of product and the name of the manufacturer, distributor, and miner.

A.20.   Plaintiff does not recall being exposed to asbestos-containing products outside the scope of his employment at this time.

21.    Have you ever been a member of any labor union? If so, state:

    (a)    the name and address of each local, national and international labor union;

    (b)    the inclusive dates of your membership; and

    (c)    any positions you have held with each such labor union, and the dates during which you held such positions.

A.21.I. No.

22.    State whether you have ever seen or received any information, instruction, direction, warning, or directive, from any source whatsoever, concerning alleged dangers of exposure to asbestos or asbestos-containing products, and if so, identify:

    (a)    each such warning, directive, notification, direction, instruction, or information;

    (b)    the means by which such was given to you;

    (c)    the source and the date on which it was received by you; and

    (d)    your response or reaction, including any complaints made or changes in work habits.

A.22.   No.

23.    State whether you had available for use during any period of your employment, respirators or masks or other dust inhalation inhibitor, or protective gear and, if so, state

00118098.WPD                                    23

the following:

    (a)    the period of time during which said items were available;

    (b)    what instructions were given with regard to the use of each of said items;

    (c)    whether you used said items and the dates of your use;

    (d)    whether you ever requested said items, and, if so, when, where and to whom the request was made, and the response to the request.

A.23.  No.

24.    If you are making a claim for loss of earnings or impairment of earning power because of your medical conditions, state the following:

    (a)    date of commencement of any loss or impairment;

    (b)    the name and address of your employer, your job title and your monthly or weekly rate of pay at the time of the alleged commencement of any loss or impairment;

    (c)    if you had more than one employer during the three year period prior to the date of the commencement of any loss or impairment, as indicated on Chart A, provide your monthly or weekly rate of pay and inclusive dates of such employment during the three year period;

    (d)    your total earnings for the period of three years prior to the commencement of any loss or impairment;

    (e)    the inclusive dates during which you allege that you were unable to work

00118098.WPD               24

as a result of any loss or impairment and the total amount of pay you claim

you lost  because of this absence;

(f)    the date on which any loss or impairment ended; and

(g)    your monthly or weekly rate of pay which you have received, from the date

of any loss or impairment ended through the present time.

A.24.  Plaintiff does not assert a claim for lost of earnings.

25.    Do you claim damages for loss of consortium, society, affection, services, or

sexual enjoyment?  If so, please set forth in complete detail all facts on which this claim

is based, including a complete description of the loss suffered.

A.25.  Plaintiff does not assert a claim for loss of consortium.

26.    For each person who is or was partially or totally dependent upon you for

financial support and assistance during the last ten years, state:

(a)    the name, address, sex, age  and  relationship; and

(b)    the amounts you contributed during the last ten years for support and

assistance.

A.26I. (a)    Traute Hogan; Deceased; 83; female; spouse.

(b)    Total support.

27.    State, in the form of an itemized list, all special damages alleged in this lawsuit

including, but not limited to, hospital charges, medical charges, medicines, lost wages,

etc., naming the person or organization to whom each item of expense was paid or is due,

and, if paid, by whom each item of expense was paid.

A.27.   Expenses are ongoing; to be provided.

28.     Identify and give the substance of all written statements, recordings, or videotapes

which relate to the facts of this lawsuit and the damages you claim given by plaintiff or

any witness (provided such information is in plaintiff's possession, custody or control

and/or such statements, recordings or videotapes are not protected by the attorney-client

privilege) in the above-captioned matter.

A. 28.   None.

29.     Have you ever made any claim for, or received any, health or accident

insurance benefits, social security benefits, state or federal benefits for disabilities,

workers' compensation benefits, veterans' benefits, tort claims or suits, Federal Employers

Liability Act claims or suits, Longshoremen and Harbor Workers Act claims or suits,

unemployment  compensation insurance benefits, or early payment from any public or

private pensions due to disability or your medical condition?  If so, state the following:

    (a)     the date and place where each such claim was made;

    (b)     the name and nature of the entity with which the claim was made;

    (c)     any identifying number, such as a docket or petition number, for each

        claim;

(d)    the defendant, agency, insurer, employer or other entity to or against whom the claim was made and its file number;

(e)    the nature of the claim;

(f)    whether you were examined by a physician and if so, the name and address of that physician;

(g)    the result of such claim, including the amount realized by way of settlement, judgment or award upon the claim;

(h)    the name and address of any attorney who represented you with regard to such claims; and

(I)    whether you are presently receiving such benefits.

A.29.  To be provided.

30.    State the following with regard to your asbestos-related legal action:

(a)    Did you file an asbestos-related claim in more than one (1) jurisdiction;

(b)    Identify all of the jurisdiction(s) where an asbestos-related claim has been filed (whether or not these claims have been dismissed or discontinued or otherwise resolved) on your behalf;

(c)    Did you file your asbestos-related claim(s) under more than one (1) Index Number; and

(d)    Provide all of the Index Numbers for all of your asbestos-related claim(s), including all multiple Index Numbers for Claims filed in New York County.

A.30.    Subject to the foregoing general objection, plaintiff responds as follows:

    (a)     No.

    (b)     New York County.

    (c)     No.

    (d)     Index No.: 08/106649.

31.    State whether or not you have made, filed, or submitted a Claim Against Bankrupt Entity or received funds in settled from a Bankrupt Entity. If so, for each claim state the following:

    (a)     the date and place where each such claim was made;

    (b)     the name and nature of the entity with which the claim was made;

    (c)     any identifying number, such as a docket or petition number, for each claim;

    (d)     the defendant, agency, insurer, employer or other entity to or against whom the claim was made and its file number;

    (e)     the nature of the claim;

    (f)     whether you were examined by a physician and if so, the name and address of that physician; and

    (g)     whether you received any compensation as a result of such claim, but not the amount.

A.31.    Subject to the foregoing general objection, plaintiff responds as follows: No.

00118098.WPD                                    28

32.     State whether you have applied to any Bankrupt Entity or Bankruptcy Court to lift

the stay as to your claim or otherwise have attempted to join a Bankrupt Entity to

this action.


A.32    Subject to the foregoing general objection, plaintiff responds as follows:

As of the present time, plaintiff has neither applied to any Bankrupt Entity or

Bankruptcy Court to lift the stay nor otherwise attempted to join a Bankrupt Entity to this

action because any such action would be contrary to federal law which provides that

plaintiff is barred from proceeding against any Bankrupt Entities in this action. Further,

any such action would force the Bankrupt Estate or Settlement Trust to unnecessarily

incur litigation costs, thereby causing an unnecessary drain on trust assets that are

designed to benefit asbestos victims.


33.     Have you or your spouse ever been a party to or a witness in any lawsuit, court or

administrative proceeding?  If so, please state:

   (a)     whether you or your spouse were a party or witness and if party, whether

           plaintiff or defendant;

   (b)     the precise name of the lawsuit or proceeding, the court agency in which it

           was brought and the docket number;

   (c)     the nature of the charges or claims and, if you or your spouse were a

           witness, the subject matter of the testimony; and

   (d)     the disposition of the case.

A.33.  No.


34.     Have you or your spouse filed a claim seeking compensation for any alleged

asbestos-related condition from any entity, including settlement trusts?  Specify "Yes" or

"No" only.

A.34.  Other than the present lawsuit, no.


35.     Identify all entities, whether or not parties to this lawsuit, with whom you have

        settled or agreed to settle this lawsuit.


A. 35.  Settlements are ongoing. A list will be provided of all defendants not dismissed by

        Summary Judgement or otherwise immediately prior to trial.


36      Identify all persons, other than your attorneys, who provided you with any

information used in answering these interrogatories, and state the particular information

each person supplied.


A.36.   Myself.

## REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to paragraph 19 of the CMO, the defendants request that plaintiffs produce for inspection and copying, the documents and things identified below. The documents and things identified herein shall be produced for inspection and copying at such time as the answers to the interrogatories herein are filed.

You are hereby requested to produce the following documents and things:

1.      All documents identified in your answers to these interrogatories.

R.1.    Such documents will be produced, to the extent required by the relevant rules.

2.      All documents relating to the plaintiff's job qualifications and professional licenses held.

R.2.    If any such documents are located in plaintiff's possession, they will be produced.

3.      All documents relating to the plaintiff's membership in any labor trade association or professional organization.

R.3.    Not applicable.

4.      All documents relating to the plaintiff's military or foreign service, including and not limited to, personnel records, discharge papers, military occupational specialty qualifications, promotions, reductions or disciplinary actions.

R.4.    Authorizations have been provided to Recordtrak, 651 Allendale Road, King of Prussia, PA 19406.

5.      All documents relating to any claim or demand ever made by the plaintiff for damages, compensation or other benefits allegedly resulting from any illness or

injury, including but not limited to, Industrial Accident Board records, social

security disability claim records, federal or state employment compensation claim

records, social disability records, pension claim record or any other health or

accident insurance claim records.

R.5.   Authorizations have been provided to Recordtrak, 651 Allendale Road, King of

Prussia, PA 19406.

6.   All documents in plaintiff's possession, custody or control relating in any way to

the plaintiff's exposure or possible exposure to asbestos, asbestos-containing

products and/or asbestos-containing materials.

R.6.   At this time, plaintiff has no such documents in his personal possession.

7.   All documents in plaintiff's possession, custody or control relating in any way to

the plaintiff's exposure or possible exposure to silica, acids, beryllium, nuclear

radiation, ammonia, cadmium, chlorine, chromate, phosgene, grinding dust, coal

dust, cotton dust, nickel, welding smoke or fumes.

R.7.   At this time, plaintiff has no such documents in his personal possession.

8.   All documents, of which you have ever become aware, relating in any way to

warnings, potential health hazards, instructions or precautions regarding the use or

handling of, or exposure to, asbestos, asbestos-containing products, and/or

asbestos-containing materials.

R.8.   At this time, plaintiff has no such documents in his personal possession.

9.   All applications prepared or submitted by or on behalf of the plaintiff for life

insurance, medical insurance, health and accident insurance, and/or disability

00118098.WPD                                    32

insurance.

R.9.   At this time, plaintiff has no such documents in his personal possession.

10.   All statements, recorded interviews, films, videotapes, reports, questionnaires,

forms or other documents made, submitted, compiled, prepared or filled out by,

on behalf of, or under the direction of, plaintiff relating in any way to exposure or

alleged exposure to asbestos, asbestos-containing products and/or

asbestos-containing materials or any other issues relating to this lawsuit except

that information prepared by, for, or at the request of plaintiff's counsel must be

identified (including the date made), but need not be produced without an order by

the Court, provided that written or recorded communication between plaintiff and

counsel, made after an attorney-client relationship has been established, and

attorney work product, need not be produced or identified.

R.10.   Objection.  Attorney/client privilege; work product privilege.

11.   All records in plaintiff's possession, custody or control relating to comments,

complaints, suggestions, or proposals made to your employer or your union, by

yourself or by other employees or union members regarding asbestos exposure.

R.11.   At this time, plaintiff has no such documents in his personal possession.

12.   All written, recorded, filmed, transcribed or videotaped statements of all parties

and non-party declarants pertaining to the subject of this lawsuit, except that

information prepared by, for, or at the request of plaintiff's counsel must be

identified (including the date made), but need not be produced without an order by

the Court, provided that written or recorded communication between plaintiff and

counsel made after an attorney-client relationship has been established and

attorney work product need not be produced or identified.

R.12.  Objection.  Attorney/client privilege; work product privilege.

13.  All photographs of the plaintiff at work or in work clothes and all photographs of

all products or conditions complained of in the plaintiff's place of employment.

R.13.  At this time, plaintiff has no such photographs in his personal possession.

14.  Copies of all itemized bills covering all the special damages and losses and

expenses claimed in this matter.

R.14.  See A.27.  Bills to be provided if located.

15.  Copies of all reports, correspondence and records from any doctor who has

examined the plaintiff, any hospital where the plaintiff has been treated either as

an inpatient or as an outpatient, except for any reports, records, correspondence, or

communications issued by any consulting physicians who have been retained or

specially employed in anticipation of litigation or preparation for trial and who are

not expected to be called as a witness at trial.

R.15.  Medical authorizations have been provided to RecordTrak, 651 Allendale Road,

King of Prussia, PA 19406.

16.  All tissue specimens, tissue slides, and x-ray films and CT scans pertaining to the

plaintiff.

R.16.  See Answer R.15 above.

17.  Copies of plaintiff's income tax returns for the last ten years of plaintiff's

employment and up to the current year as well as any other documents, including

economic loss reports, upon which plaintiff relies in support of his claims. If loss

of earnings or earning capacity is alleged or claimed to have occurred before the

current year, include copies of the income tax returns of the plaintiff from ten

years prior to the claimed loss and up to the current tax year.

R.17.   Plaintiff does not assert a claim for loss of earnings.

18.   Any asbestos and/or asbestos-containing products or product packaging of the

type to which the plaintiff alleges exposure and which the plaintiff has in his

possession, custody or control.

R.18.   At this time, plaintiff has no such products in his personal possession.

19.   All photographs, charts, drawing, diagrams or other graphic representations

depicting work conditions at work sites where the plaintiff claims the plaintiff was

exposed to asbestos or asbestos-containing products.

R.19.   To be produced if located.

20.   All invoices, bills, statements and any other writings or records which the plaintiff

contends evidence the sale of any products containing asbestos to the place of the

plaintiff's employment at which plaintiff claims that plaintiff was exposed to

asbestos. This does not include documents in the possession, custody or control

of plaintiff's attorney unless such documents were provided by plaintiff to his/her

attorney and are not privileged.

R.20.   At this time, plaintiff has no such documents in his personal possession.

21.   Any written advice, publication, warning, order, directive, requirement, or

recommendation, which advised or warned of the possible harmful effects of

exposure to or inhalation of asbestos or asbestos-containing products in the

products in the possession, custody or control of the plaintiff.

R.21.   Objection.  Work product, over-broad, unduly burdensome and irrelevant.

Subject to this objection, appropriate exhibit and witness lists will be provided at

the appropriate time.

22.   Any accident or incident reports which relate to the facts, circumstances or

incidents which form the basis of plaintiff's complaint.

R.22.   At this time, plaintiff has no such documents in his personal possession.


Dated:       New York, New York
             May 27, 2008


                    LEVY PHILLIPS & KONIGSBERG, LLP


                    Audrey P. Raphael, Esq.
                    *Attorneys for Plaintiffs*
                    800 Third Avenue, 13th Floor
                    New York, NY  10022
                    (212) 605-6200

CHART A
JOBSITE-SPECIFIC EXPOSURE HISTORY

Re: Edward Joseph Hogan

| Name of Employer | Dates of Employ-ment | Asbestos Related Jobsite & Address | Dates You Were at Jobsite | Job Duties | ACM[1] Used Personally | Other ACM to Which You Were Exposed[2] | Other Workers on Jobsite including supervisor | ACM identified by Such other workers | Other companies Using ACM at Jobsite |
|---|---|---|---|---|---|---|---|---|---|
| Unknown | Approx 1939 - 1942 | Commercial building in New York | Approx 1939 - 1942 | Elevator Operator | No known asbestos exposure | No known asbestos exposure | | | |
| U.S. Navy | 1942 - 1945 | USS South Dakota<br><br>Brooklyn Navy Yard - approximately 4 months during overhaul | 1942 - 1945 | Seaman | At this time plaintiff believes he was exposed to various types of asbestos-containing materials including but not limited to gaskets and packing while he served on the USS South Dakota and at the Brooklyn Navy Yard.<br><br>At this time plaintiff believes that he was exposed to asbestos contained in and/or covering boilers, pumps, compressors, condensers, turbines, engines, generators and other like equipment.<br><br>Plaintiff cannot presently identify all of the manufacturers of such materials and equipment but states that he would have been exposed to all such products manufactured and used during the period he served on the USS South Dakota and at the Brooklyn Navy Yard. | At this time plaintiff believes he worked around and/or was in the vicinity of various types of asbestos-containing materials including gaskets and packing while he served on the USS South Dakota and at the Brooklyn Navy Yard.<br><br>At this time plaintiff believes that he worked around and was in the vicinity of asbestos contained in and/or covering boilers, pumps, compressors, condensers, turbines, engines, generators and other like equipment.<br><br>Plaintiff cannot presently identify all of the manufacturers of such products but states that he would have worked around all such equipment and materials manufactured during the periods he served on the USS South Dakota and at the Brooklyn Navy Yard. | | | |

00118207.WPD

CHART A
JOBSITE-SPECIFIC EXPOSURE HISTORY

Re: Edward Joseph Hogan

| Name of Employer | Dates of Employ ment | Asbestos Related Jobsite & Address | Dates You Were at Jobsite | Job Duties | ACM[1] Used Personally | Other ACM to Which You Were Exposed[2] | Other Workers on Jobsite including supervisor | ACM identified by Such other workers | Other companies Using ACM at Jobsite |
|---|---|---|---|---|---|---|---|---|---|
| U.S. Navy Continued | | | | | | Plaintiff will further rely upon the testimony of co-workers and other evidence demonstrating the presence of various manufacturers' products on board the USS South Dakota and at the Brooklyn Navy Yard during the time plaintiff was exposed. | | | |
| St. Albans Hospital, Queens Naval Hospital | Approx 1945 - 1946 | St. Alban Hospital, Queens Naval Hospital | Approx 1945 - 1946 | Building Maintenance | At this time plaintiff believes he was exposed to various types of asbestos- containing materials and equipment while performing maintenance work.<br><br>Plaintiff cannot presently identify all of the manufacturers of such materials and equipment but states that he would have been exposed to all such products manufactured and used during the period he worked at this site.<br><br>Plaintiff will further rely upon the testimony of co-workers and other evidence demonstrating the presence of various manufacturers' products at this site during the time plaintiff believes he was exposed. | At this time plaintiff believes he worked in the vicinity of others who handled and/or worked with various types of asbestos- containing materials and equipment.<br><br>Plaintiff cannot presently identify all of the manufacturers of such materials and equipment but states that he would have been exposed to all such products manufactured and used during the period he worked at this site.<br><br>Plaintiff will further rely upon the testimony of co-workers and other evidence demonstrating the presence of various manufacturers' products at this site during the time plaintiff believes he was exposed. | | | |

00118207.WPD

**CHART A**
**JOBSITE-SPECIFIC EXPOSURE HISTORY**

Re: Edward Joseph Hogan

| Name of Employer | Dates of Employment | Asbestos Related Jobsite & Address | Dates You Were at Jobsite | Job Duties | ACM[1] Used Personally | Other ACM to Which You Were Exposed[2] | Other Workers on Jobsite Including supervisor | ACM identified by Such other workers | Other companies Using ACM at Jobsite |
|---|---|---|---|---|---|---|---|---|---|
| Levitt & Company (Howard Mandell Sub-contractors) | Approx 1946 - 1951 | Various residential sites in Levittown, NY | Approx 1946 - 1951 | Construction Worker | At this time plaintiff believes he handled and/or worked with various types of asbestos-containing materials and equipment including but not limited to: caulking compound, cement, joint compound and floor tiles<br><br>Plaintiff cannot presently identify all of the manufacturers of such materials and equipment but states that he would have been exposed to all such products manufactured and used during the period he worked at these sites.<br><br>Plaintiff will further rely upon the testimony of co-workers and other evidence demonstrating the presence of various manufacturers' products at these sites during the time plaintiff believes he was exposed.<br><br>At this time plaintiff recalls:<br><br><u>Caulking Compound:</u><br>Benjamin Moore | At this time plaintiff believes he worked in the vicinity of others who handled and/or worked with various types of asbestos-containing materials including but not limited to: caulking compound, cement, joint compound and floor tiles<br><br>Plaintiff cannot presently identify all of the manufacturers of such materials and equipment but states that he would have been exposed to all such products manufactured and used during the period he worked at these sites.<br><br>Plaintiff will further rely upon the testimony of co-workers and other evidence demonstrating the presence of various manufacturers' products at these sites during the time plaintiff believes he was exposed. | | | |
| | Approx 1951 - 1952 | Various residential sites in Levittown, PA | Approx 1951 - 1952 | | | | | | |

00118207.WPD

CHART A
JOBSITE-SPECIFIC EXPOSURE HISTORY

Re: Edward Joseph Hogan

| Name of Employer | Dates of Employ ment | Asbestos Related Jobsite & Address | Dates You Were at Jobsite | Job Duties | ACM[1] Used Personally | Other ACM to Which You Were Exposed[2] | Other Workers on Jobsite Including supervisor | ACM identified by Such other workers | Other companies Using ACM at Jobsite |
|---|---|---|---|---|---|---|---|---|---|
| Levitt & Company (Howard Mandell Sub-contractors) continued | | | | | **Joint Compound:** Georgia Pacific Kaiser Gypsum National Gypsum - Gold Bond United States Gypsum  **Vinyl Asbestos Tile:** Kentile  **Paints and Finishes:** Bondex | At this time plaintiff recalls:  **Caulking Compound:** Benjamin Moore  **Joint Compound:** Georgia Pacific Kaiser Gypsum National Gypsum - Gold Bond United States Gypsum  **Vinyl Asbestos Tile:** Kentile  **Paints and Finishes:** Bondex | | | |
| Denny Corporation, Philadelphia, PA | Approx 1952 - 1968 | Various residential sites in Philadelphia | Approx 1952 - 1968 | Construction Worker | See Levitt above | See Levitt above | Norman Denny | | |
| Self- Employed | Approx 1968 to 1974 | Stow Away Motel, Daytona Beach, FL | Approx 1968 to 1974 | Owner | No known asbestos exposure | No known asbestos exposure | | | |
| Self- Employed | Approx 1974 - 1977 | Edward's Cocktail Lounge, South Daytona Beach, FL | Approx 1974 - 1977 | Owner | No known asbestos exposure | No known asbestos exposure | | | |

00118207.WPD

CHART A
JOBSITE-SPECIFIC EXPOSURE HISTORY

Re: Edward Joseph Hogan

| Name of Employer | Dates of Employment | Asbestos Related Jobsite & Address | Dates You Were at Jobsite | Job Duties | ACM[1] Used Personally | Other ACM to Which You Were Exposed[2] | Other Workers on Jobsite Including supervisor | ACM Identified by Such other workers | Other companies Using ACM at Jobsite |
|---|---|---|---|---|---|---|---|---|---|
| Self- Employed | Approx 1977 - 1981 | Sally's Hot Dogs Mobile Concession Stand, Daytona Beach, FL | Approx 1977 - 1981 | Owner | No known asbestos exposure | No known asbestos exposure | | | |

1.     ACM - Asbestos Containing Materials of Products.

2.     Identify brand and manufacturer names, if known.

00118207.WPD

Edward Hogan (DOB: 05/12/22 – 85 WM)
January 03, 2008

HISTORY OF PRESENT ILLNESS: He was initially evaluated 10/07 at LMC after a cardiopulmonary arrest. He was noted to have a 1.5 cm right upper lobe lung mass at that time. He was evaluated by Cindy Thompson, R.N. 11/15/07 and work up of the nodule was discussed. A repeat CT scan of the chest was performed 12/19/07 and revealed the right upper lobe lung mass to have increased from 1.5 to 2.1 cm and there were three other possible nodules noted on the right side. The patient is seen today to discuss the CT scan as well as the work up. He remains fairly active at home and is able to do most of his activities. He is a previous 40-pack year cigarette smoker and has been exposed to asbestos in the past. All medications were reviewed.

PHYSICAL EXAMINATION: He is in no respiratory distress at rest. Vital signs are reviewed and reveal a BP of 120/76 and Weight is 171 pounds. The neck reveals a right supraclavicular node, which is tender and mobile. The chest is symmetric and lungs are fairly clear bilaterally. Cardiac exam is normal. There is no pedal edema. Skin reveals multiple keratoses and resected areas of skin cancer. The remainder is negative.

DATA REVIEWED: The CT scan from 12/19/07 was reviewed with the patient and his daughter. Previous records were also reviewed.

IMPRESSION:
1.    Right upper lobe lung mass increased in size over three months. This likely represents a primary bronchogenic carcinoma. The small nodules could represent areas of metastasis or scar.
2.    Probable COPD with previous tobacco use.
3.    Status post cardiopulmonary arrest 10/07.

RECOMMENDATIONS: Long discussion with the patient and his daughter about the probable diagnosis and the way to proceed. Different options were discussed such as bronchoscopy, FNA under CT guidance, FNA or resection of the right supraclavicular lymph node. He was told that surgery would be the best option, but that at his age had significant risks involved and may not be curative. I also told the patient and his daughter that I would not undergo an extensive work up unless the end point would be either surgery or chemotherapy/radiation therapy for cure or palliation. I discussed the probable outcomes with the different modes of therapy. I gave the patient and his daughter my opinion about how I would proceed if this were me or a relative. My opinion

-Continued-

Edward Hogan (DOB: 05/12/22 – 85 WM)
January 03, 2008
Page Two

would be to do nothing at this time and to engage Hospice when he starts to slow down
physically. Both the patient and his daughter are leaning towards this, but will discuss it
further. They will be in contact with Dr. Lobel when they need Hospice. Follow up with
me p r n

Paul M. Kirschenfeld, M.D., FACP, FCCP

PMK/rlh

cc: Keith Lobel, M.D.

RADIOLOGY DEPARTMENT
LEXINGTON MEDICAL CENTER – LEXINGTON
811 WEST MAIN STREET
LEXINGTON, SC 29073
PHONE: (803) 358-6120

PATIENT: HOGAN,EDWARD J

AGE: 85
DOB: 05/12/1922
SEX: M

UNIT/MR NO: M001494620
ACCT NO: X00003699899
SSN: 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
REQ NO: 07-0030451
REPORT NO: 1220-0094

PT LOCATION: LEXCTSCAN

ORDERING DR: PAUL M. KIRSCHENFELD MD        KIRPAU PUL

---

REPORT STATUS: Signed

---

ORDERED BY: PAUL M. KIRSCHENFELD MD
LOCATION: REG CLI LEXCTSCAN
STUDY TYPE: 1219-0003 LCAT/CT CHEST WC

DATE OF EXAM: 12/19/07

CLINICAL DATA: 85M, RIGHT LUNG MASS

CT CHEST (WITH CONTRAST):

   TECHNIQUE: CT scan was performed with 5 mm axial images obtained from the thoracic inlet inferiorly to the hemidiaphragms with the infusion of 100 cc of Isovue 370. The exam was compared to prior study of 10/05/2007.

   FINDINGS: A pace-maker is seen in position. The heart size is within normal limits with no definite pathologic mediastinal adenopathy seen. There is a right upper lobe speculated mass that measures up to 2.1 cm in diameter and has slightly increased in size since prior study of 10/05/2007. In addition, on image 15 there is suspicion of a small nodule peripherally in the right lung as well as a 6 mm nodule peripherally in the right lung on image 18. On image 30 there is also suspicion of a developing speculated lesion in the right lower lobe. No pleural effusion is seen. The left lung remains clear. Incidental note is made of a large cyst involving the left lobe of the liver.

   IMPRESSION: Large speculated mass in the right lung apex that is likely increased in size since prior exam and very suspicious for a malignant lesion. In addition, there are several small speculated lesions and nodules in the right lung that may represent metastatic foci.

   If the patient does not have a known tissue diagnosis then additional pulmonary evaluation is suggested if the findings are most consistent with a neoplastic process.

SA                                JAMES D WHITEHEAD MD

---

KIRSCHENFELD,PAUL M. MD
ORDER#/PROCEDURE: 1219-0003 LCAT/CHEWC (71260TC)
EXAM TECH: SLFAY
REP RELEASED BY: HAYJOH RAD 12/23/07 1511
ADD RELEASED BY:
DISC DATE
ED DISC DIAG:

PT LOC/ROOM: LEXCTSCAN/

HOGAN,EDWARD J

Edward Hogan (DOB 5/12/22)
11/15/07

CHIEF COMPLAINT: "Lung mass detected on x-ray during hospital stay"

HISTORY OF PRESENT ILLNESS: This is a very pleasant, 85-year-old Caucasian male, who is accompanied today by his daughter. He was a patient at Lexington Medical Center, admitted on 10/5/07 in cardiorespiratory arrest due to severe pneumonia. We were consulted during that hospitalization related to an abnormal CT scan of the chest, which indicated a 1.5 cm spiculated mass near the apex of the right upper lobe. Questionable primary malignancy as the etiology. The patient is here today for follow up on that abnormal CT scan of the chest as well as after hospital follow up. He indicates that he has been doing well since his hospitalization. He has had follow up with his cardiologist. He and his daughter have multiple questions today concerning the potential treatment of an abnormal lung mass. Multiple topics were discussed to include the abnormal CT scan from Lexington Medical Center, as well as bronchoscopy for evaluation, as well as CT guided needle biopsy, fluoroscopy, and thoracotomy. There was also discussion concerning chemotherapy and radiation. The focus of the appointment today was more for information gathering concerning the plan of treatment for the lung nodule versus any specific complaints of shortness of breath or hemoptysis and so forth. The patient is still very unclear as to whether or not he wants to undergo any diagnostic evaluation of the lung mass. Greater than 30 minutes was spent in dialogue with the patient as well as the patient's daughter answering questions concerning how to proceed with evaluation of the lung nodule. In the end, the decision was left to the patient. He was given a number to contact our office in the event that he decides on further workup of the lung nodule. If the patient does decide on further intervention related to lung nodule, repeat CT scan of the chest with contrast should be the initial step to ensure that the nodule is still an area of concern. Once review of the second CT is undertaken, further recommendations would be pending. For complete history and physical information, please refer to hospital consultation note per Teresa Durden, N.P.

OBJECTIVE: Very pleasant, well-nourished, Caucasian male, who is awake, alert, and in no acute distress. Vitals: Blood pressure: 110/78. Temperature: 98.5. Pulse: 78. Respirations: 20. Oxygen saturation: 95% on room air. Weight today is 165 pounds. HEENT: Normocephalic atraumatic. Pupils equal, round, reactive to light. Extra ocular movements are intact. Neck is supple without JVD or lymph adenopathy. Cardiac: regular rate and rhythm without murmur, thrill, gallop or rub. Lungs: scattered crackles in the bilateral bases. Abdomen is soft and non-tender. Positive bowel sounds x 4 quadrants. Extremities: 2 + radial and dorsalis pedis pulses are equal bilaterally. No edema, clubbing or cyanosis. Neurologic: cranial nerves 2-12 are grossly intact.

ASSESSMENT & PLAN: Right upper lobe nodule–We will await the patient's decision as to whether additional workup should be undertaken. As dictated above, initial step with the patient's decision for additional workup should be repeat CT of the chest with contrast to verify the nodule is still existent. Further recommendations will be pending the CT of the chest. It is

Edward Hogan (DOB 5/12/22) Page 2
11/15/07

noted that this is a very emotional decision for this patient. He became very tearful in the office today. He was, however, accompanied by a very supportive daughter. We have kept all of his films from Lexington Medical Center that were brought in by the patient today as well as the chest x-ray undertaken in the office today. These films should be on file in our file room.

Cindy Thompson, R.N., A.C.N.P.

CT/amd

D: 11/15/07 R: 11/16/07 T: 11/19/07

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK )
)ss.:
COUNTY OF NEW YORK )

    **CORRINNE DONALDSON** being duly sworn deposes and says she is an employee of Levy Phillips & Konigsberg, L.L.P., the attorneys for the plaintiffs herein, that she is over 18 years of age and is not a party to the within action, that on the 28th day of May, 2008, a copy of **Plaintiffs' Answer To Defendants' Fourth Amended Standard Set Of Interrogatories And Request For Production Of Documents** on behalf of **Edward Hogan** was caused to be mailed via first class mail to:

Genevieve MacSteel, Esq.
McGUIREWOODS
1345 Avenue of the Americas, 7th Floor
New York, NY 10105
*Attorneys for American Standard, Inc.*

Nancy McDonald, Esq./Joseph P. LaSala, Esq.
McELROY, DEUTSCH, MULVANY &
CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ 07962
*Attorneys for A.O. Smith Water Products Company and Tuthill Energy Systems, Inc.*

Julie Evans, Esq.
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER, LLP
150 East 42nd Street
New York, NY 10017
*Attorneys for A.W. Chesterton Co., Inc. and Carrier Corporation*

Anna DiLonardo, Esq.
WEINER LESNIAK, LLP
888 Veterans Memorial Highway, Suite 540
Hauppauge, NY 11788
*Attorneys for Bondex International, Inc.*

Edward J. Wilbraham, Esq./ John S. Howarth, Esq.
WILBRAHAM, LAWLER & BUBA
1818 Market Street
Philadelphia, PA 19103
Attorneys for Buffalo Pumps, Inc.

John Fanning, Esq.
CULLEN & DYKMAN LLP
177 Montague Street
Brooklyn, New York 11201
*Attorneys for Burnham Holdings, Inc. and Goulds Pumps Incorporated*

Judith Yavitz, Esq.
REED SMITH, LLP
599 Lexington Avenue
New York, NY 10022
*Attorneys for Certainteed Corporation and Union Carbide Corp.*

Cori Leavitt, Esq./ William J. Bradley III, Esq./
Robert C. Malaby, Esq.
MALABY & BRADLEY, LLC
150 Broadway, Suite 600
New York, NY 10038
*Attorneys for Cleaver-Brooks Inc., J.H. France Refractories Co., Viacom, Inc. and Weil McLain*

Michael Waller, Esq.
KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS, LLP
One Newark Center, 10th Floor
Newark, NJ 07102
*Attorneys for Crane Co. and Crane Pumps & Systems, Inc.*

William Mueller, Esq.
CLEMENTE MUELLER & TOBIA, P.A.
P.O. Box 1296
Morristown, NJ 07962
*Attorneys for Durabla Manufacturing Company*

Donald Fay, Esq.
WATERS McPHERSON McNEIL, P.C.
300 Lighting Way
P.O. Box 1560
Secaucus, NJ 07096
*Attorneys for Elliott Turbomachinery Co.*

John A. Turlik, Esq./Dave Weinberg, Esq.
SEGAL McCAMBRIDGE
SINGER & MAHONEY, LTD.
830 Third Avenue, Suite 400
New York, NY 10022
*Attorneys for Fairbanks Morse Pump Corp., Garlock Sealing Technologies, LLC, Gardner Denver, Inc. and The Anchor Packing Company*

Peter Langenus, Esq.
SCHNADER, HARRISON, SEGAL & LEWIS
140 Broadway, Suite 3100
New York, NY 10005
*Attorneys for Fort Kent Holdings, Inc.*

00118400.WPD

Michael A. Tanenbaum, Esq./Diane Pompei, Esq.
SEDGWICK, DETERT, MORAN & ARNOLD LLP
Three Gateway Center, 12th Floor
Newark, NJ 07102
*Attorneys for Foster Wheeler Energy Corp. and
General Electric Company*

Scott R. Emery, Esq.
LYNCH DASKAL EMERY, LLP
264 West 40th Street
New York, NY 10018
*Attorneys for Georgia-Pacific Corporation*

Suzanne Halbardier, Esq.
BARRY McTIERNAN & MOORE
2 Rector Street, 14th Floor
New York, NY 10006
*Attorneys for General Refractories Co.*

Peter Stasz, Esq.
47 Westfield Industrial Park
Westfield, MA 01085
*Attorneys for HB Smith Company*

Kerryann M. Cook, Esq./Richard E. Leff, Esq./
Philip J. O'Rourke, Esq.
McGIVNEY & KLUGER, P.C.
80 Broad Street, 23rd Floor
New York, NY 10024
*Attorneys for Aurora Pump Company Hercules
Chemical Company, Inc. and TACO, Inc., The
Falk Corporation and Kentile*

Lisa A. Linsky, Esq.
McDERMOTT, WILL & EMERY, LLP
340 Madison Avenue
New York, NY 10173
*Attorneys for Honeywell International, Inc.*

Joseph Colao, Esq.
LEADER & BERKON
630 Third Avenue, 17th Floor
New York, NY 10017
*Attorneys for IMO Industries, Inc.*

Jennifer Darger, Esq.
DARGER & ERRANTE, llp
116 E. 27th Street, 12th Floor
New York, NY 10016
*Attorneys for Hopeman Brothers, Inc. and Lennox
Industries, Inc.*

Abbie Eliasberg Fuchs, Esq.
HARRIS BEACH, PLLC
100 Wall Street, 23rd Floor
New York, NY 10005
*Attorneys for Kentile Floors, Inc.*

Rob C. Tonogbanua
DICKIE McCAMEY & CHILCOTE, P.C.
20 West Kings Highway, Suite 200
Haddonfield, NJ 08033-2116
*Attorneys for Kunkle Industries and Tyco Flow
Control, Inc.*

Daniel J. McNamara, Esq.
DeCICCO GIBBONS & McNAMARA, P.C.
14 East 38th Street
New York, NY 10016
*Attorneys for Kaiser Gypsum Company, Inc.*

Linda Yassky, Esq.
SONNENSCHEIN NATH & ROSENTHAL, LLP
1221 Avenue of the Americas, 23rd Floor
New York, NY 10020
*Attorneys for Rapid-American Corporation*

Lisa M. Pascarella, Esq.
PEHLIVAN, BRAATEN & PASCARELLA, LLC
Paytner's Ridge Office Park
2430 Route 34
Manasquan, NJ 08736
*Attorneys for Ingersoll-Rand Company and
Rheem Manufacturing Company*

**COUNSEL UNKNOWN FOR:**
BENJAMIN MOORE & CO.
C.H. WHEELER
CONSOLIDATED VALVE, LTD.
DIAL CORP.

by depositing a true copy of the same securely enclosed in a post-paid wrapper in the Post Office
regularly maintained by the United States Government in said County of New York directed to said
attorneys.

CORRINNE DONALDSON

Sworn to before me this
28th day of May, 2008

NOTARY PUBLIC

00118400.WPD

ELLEN T. PINE
Commissioner of Deeds, City of N.Y.
No. 4-1544
Certificate Filed in New York County
Commission Expires November 1, 2009



## AFFIDAVIT OF DAVID HOBSON

David Hobson states as follows:

1.     I adopt and incorporate by reference for purposes of this case the statements contained in the affidavit that I executed on October 17, 2003.

2.     By virtue of the knowledge I have obtained over the course of my career concerning the historical practices of GE and the U. S. Navy with regard to the marine steam turbines, I can state that the practices described in my October 17, 2003 affidavit concerning the U. S. Navy's control and direction related to marine steam turbines would have been applicable at least as far back in time as World War II.

3.     The Navy is a military organization that operates according to a specific chain of command. As part of that organizational structure, the Navy established specific lines of communication that GE and its employees were required to follow in dealings with the Navy and Navy personnel in connection with equipment that GE supplied or serviced for the Navy. GE and its employees did not have authority to give orders or direction to Navy personnel. The working relationship between the U.S. Navy and GE with respect to naval turbines is described in greater detail in my October 17, 2003 affidavit.

4.     Because of the nature of its mission, the Navy exercises 100% ironclad control over what goes on its ships. In this regard, the Navy had precise specifications as to the nature of any information that was to be affixed to equipment supplied to the Navy by GE. Under the Navy's specifications and procedures, as well as under actual Navy practice as it evolved in the field, GE would not have been

permitted to affix any type of warning or caution statement to a piece of equipment intended for installation onto a naval vessel, beyond those expressly specified by the Navy.

5. The Navy also had precise specifications as to the nature and contents of all written materials that were to be delivered with naval turbines, such as engineering drawings and other technical data that could be used as needed by shipboard engineering officers during the life of the equipment. Normally these materials were compiled into a volume that was generically called a "technical manual." The Navy required that every piece of equipment such as a naval turbine be supplied with a defined number of copies of one or more technical manuals. Navy personnel participated intimately in the preparation of this kind of information in a standardized format used by the Navy. This participation included extensive review and editing of drafts of the technical manuals by Navy personnel. The technical manuals were finalized and printed in final form only after the Navy had given its approval and signed off on them. These manuals included safety or hazard information only to the extent directed by the Navy.

6. During my career, I have observed many pieces of naval equipment both prior to and after installation on ships. Depending upon the time frame, some of these pieces of equipment have had certain safety or caution notices or other data stamped on plates that were attached to them. The content and format of this information is established by the Navy, not by the equipment manufacturers, and concerned matters related to the equipment itself, such as maximum operating pressure, temperature and back pressure. The Navy, not GE, determined the nature of hazards to be subject to any precautionary labeling and the content of the labeling in question. Both under the Navy's specifications and the

2

Navy's actual practices, it was the Navy, not GE, that determined the nature of any warnings to be affixed to shipboard equipment and materials.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this ___6 TH___ day of October, 2004


DAVID HOBSON

3



## AFFIDAVIT OF DAVID HOBSON

1.       I joined General Electric Company ("GE") in 1969 and was employed there until 1996, when I retired.  My last position with GE was Manager of Navy Customer Service for GE's Navy and Small Steam Turbine business in Fitchburg, Massachusetts.  Since that time I have been involved in several business ventures related to marine steam turbines and the Navy's use thereof.  Before joining GE, I received a degree in Marine Engineering from the Massachusetts Maritime Academy and was licensed for many years as a second assistant engineer by the United States Coast Guard.  I sailed as an engineering officer on steam ships and worked as an engineer in the shipbuilding industry before my employment with GE.  I was involved in marine engineering during my career at GE.  I have personal knowledge of the facts contained herein.

2.       I submit this Affidavit to attest to the level of supervision and control by the United States Navy and its officers, such as the Inspector of Naval Machinery ("INM"), over the design and manufacture by GE of equipment intended for installation on U.S. Navy vessels, particularly marine steam turbines.

3.       During my 27 years of employment with GE, I had frequent and extensive business dealings on behalf of GE with commissioned officers and civilian employees of the United States Navy in connection with the Navy's purchase and use of marine steam turbines from GE.  Over the same time period, I also had extensive business dealings on behalf of GE with commercial shipyards and/or ship owners in connection with their purchase and use of marine steam turbines from GE.  GE sold its marine steam turbines to the Navy and commercial shipyards and/or ship owners for installation aboard ships.

4.     I have studied military and commercial specifications and other documents dating back to World War II concerning marine steam turbines and have conferred on numerous occasions with Naval officers and others involved in Naval and commercial shipbuilding. I have made frequent trips to Naval and commercial shipyards and have been aboard numerous Naval and commercial vessels in all stages of construction, testing and operation.

5.     I am personally familiar with the extent of U.S. Navy control over the production of turbines built for U.S. Navy vessels by GE because I participated in the design, manufacturing, testing and sea trials of these turbines and personally interacted with the Navy's machinery inspectors. Based on my education, training and experience, I have thorough knowledge of the historical practices of GE with regard to marine steam turbines that were purchased from GE by the Navy and commercial shipyards and/or ship owners for installation aboard ships.

6.     GE manufactured and supplied turbines for U.S. Navy ships under contract between GE and the shipyards and/or United States of America, specifically the Navy Department. That department administered the contract through Navy Sea Systems Command ("NAVSEA"), the Department of the Navy in Washington, D.C., which acted under authority of the Secretary of the Navy. NAVSEA personnel exclusively developed ship designs and plans, as well as comprehensive and detailed guidelines and specifications for all ship equipment. NAVSEA officers supervised, enforced and approved the supplier's compliance with the plans and specifications, which could only be authorized by the Navy through one of its officers.

7.     The INM, a Naval officer subordinate to various levels of command within NAVSEA, supervised GE's production of turbines for Navy vessels. The INM, who worked on-

2

site at GE's Fitchburg and Lynn plants in Massachusetts, exercised direct control over all aspects of GE's production of turbines for Navy vessels. The INM observed the manufacturing process, and enforced compliance with design specifications. All aspects of the design, performance requirements and materials used for construction, including thermal insulation for Navy vessels, were specified by NAVSEA. As manufactured and shipped to the Navy by GE, turbines did not have any thermal insulation materials (whether containing asbestos or otherwise) anywhere on them. GE did not make, sell, or install marine steam turbines with asbestos-containing thermal insulation. Any thermal insulation materials, including thermal insulation blankets, that may have been applied to GE's turbines after they left GE's manufacturing facility would have been supplied and installed by entities other than GE.

8.      GE, during all aspects of its turbine work related to U.S. Navy vessels, performed its work under the immediate supervision of the Navy through NAVSEA officers. Supervision and control were exercised through contract documents, design construction drawings, written specifications and personal oversight of GE's work by ship engineers and machinery specialists employed by the U.S. Navy.

9.      The chain of U.S. Navy authority between GE and the Secretary of the Navy was multi-tiered and staffed by officers of varying levels of responsibility. Virtually no aspect of the development, manufacture and testing of Naval turbines escaped this close control. An extensive set of General Specifications for ships of the United States Navy as well as U.S. Navy specifications or military specifications known as Mil-Specs were already in place prior to construction of a U.S. Navy vessel. The Mil-Specs comprised tens of thousands of pages and

3

governed all aspects of a vessel's design and construction and specified the materials to be used, including asbestos-containing thermal insulation.

10.    The U.S. Navy specifications for GE's marine steam turbines manufactured for the Navy incorporated several lower-level specifications for components or materials used for or with the turbines and governed detailed items like metals, bearings and gaskets. The turbines manufactured and supplied by GE for any U.S. Navy vessel had to meet detailed and precise U.S. Navy specifications. Additionally, each turbine was specifically designed for the vessel or class of vessels in question.

11.    In other words, the turbines for a vessel or class were not interchangeable, but instead, were custom built under direction and control of the Navy. NAVSEA developed the initial conceptual design for all classes of Naval vessels. In the design phase of a turbine project, as in all other phases, the U.S. Navy retained ultimate decision authority. By the time an outside design consultant began to participate in the design phase of a new turbine, the U.S. Navy had specified at least the weight, size, power output, speed, and other design parameters.

12.    If an engineering disagreement arose between the Navy and the outside design consultant, the Navy controlled the design adopted. All final design drawings and specifications required express U.S. Navy approval and adoption. Following the Navy's acceptance of a quotation for manufacture of the prototype turbine, the prototype supplier would begin tooling and constructing under continuing U.S. Navy supervision and oversight during manufacture of a turbine at sites such as the Lynn and Fitchburg plants.

13.    At each of these GE facilities, the INM was on site full time in a separate office called the Defense Contract Management Office. Frequently, GE engineers such as myself dealt

4

directly with the Navy's Turbine Section in Washington, D.C. A number of U.S. Navy civilian employees, including inspectors and engineers, supported the INM on site. At the Lynn and Fitchburg facilities, for example, INM's staff typically included more than three or four full time civilian U.S. Navy inspectors and several mechanical engineers. All members of the INM staff were Navy employees and had access to all areas of the production facility at all times. During the construction of the prototype turbine, all drawings, approvals and any reports of out-of-tolerance machining were submitted to, and approved by, the INM or by the mechanical engineers working under him.

14.    Many steps of the production process required in-process testing. For example, all welds were tested per the Navy design specification. All weld testing reports were reviewed and approved by the INM on site. The INM also approved of the procedures used to test the welds. Similarly, other test results (e.g., balance testing, vibration testing, tolerance measurements, machine variations and the like) were reviewed and approved by the INM. Any reports, which resulted in the replacement of a component part, were also sent to NAVSEA for its review.

15.    Before shipment, the turbine typically was tested per contract specification at the site of manufacture. A detailed test agenda for on-site testing was approved by the U.S. Navy. The agenda included tests for power output or speed at various levels of steam pressure, vibration and noise test, bearing temperature test and the like. The test agenda was then conducted on the turbine. The performance of the test agenda was closely monitored by the INM and all test results were submitted to him. The manufacturer then prepared a final report on the

turbine, including all test reports. The final report was then submitted for approval to the on-site INM.

16.     Following INM approval, the final report was forwarded to NAVSEA in Washington, D.C., where further approval was required before the manufacturer could ship the turbine. Following the completion of the test agenda, the turbine was fully disassembled and inspected. This was carried on in the personal presence of the on-site INM. One or more of the INM's mechanical engineers would also attend the disassembly inspection. Any contract design or manufacturing abnormalities discovered at this point would lead to rejection of the turbine or to modifications and re-testing. A report of each tear-down was prepared and was then approved and signed by the INM.

17.     Paralleling the manufacture of the prototype, the U.S. Navy would prepare a Request for Quotation on the production models of the turbine, subject to any changes developed during the production and testing of the prototype turbine unit. Once received, a quotation would then be subject to a similar review as that described above with respect to prototype unit, including quotation review meeting(s). Approval of a quotation would eventually be given to one or more vendors. Often two vendors were selected to supply production turbines. In many instances, the manufacturer of the prototype unit would secure part or all of the contract work for the production units, but in some instances the manufacturer of the prototype would not be selected for the production contract.

18.     The manufacturing process for the production unit then proceeded under the same level and intensity of U.S. Navy scrutiny and supervision as described above for the prototype unit. The INM, assisted by Navy civilian inspectors and mechanical engineers as described

6

above, would oversee and approve virtually every aspect of manufacturing and testing the turbine. As before, a test agenda for the production unit was approved by the U.S. Navy and all reports from the tests were approved by the on-site INM. Following the completion of the test series, each individual turbine was fully torn down in the presence of mechanical engineers working for the INM. Any abnormalities were noted and resolved. A final report was prepared for each turbine, incorporating the test series reports, and was approved by the on-site INM and by the Department of the Navy in Washington, D.C. Re-assembly of each turbine was then approved by the U.S. Navy civilian inspectors prior to shipment.

19.    The first production unit was then shipped to the shipyard that had construction responsibilities for the first vessel (either a Navy shipyard or a civilian yard working under contract with the Navy). The turbine was typically installed by shipyard personnel acting under supervision of engineers from the Navy Supervisor of Shipbuilding, who was subordinate to the Commander of NAVSEA.

20.    Once the turbine was installed, it was typically tested by the shipyard at the dock at some load. This testing was reviewed and approved by U.S. Navy personnel at the shipyard. Any deficiencies discovered at this stage were required to be remedied by GE under Navy direction and supervision. Once the ship was launched and outfitted, sea trials followed. The first sea trial was called the "builder's trial" and was conducted by the shipyard using its personnel with senior U.S. Navy personnel on board for observation and approval. Representatives from the major component vendors would also attend. I have attended more than twelve builder's trials as GE's turbine representative on the builder's trials. Prior to GE, I had engine room installation, operation and testing responsibility for more than twelve Navy

7

ships while employed by a major shipyard. Following successful completion of the builder's trial, the U.S. Navy would conduct an additional sea trial, called an "acceptance trial." Acceptance trials were fully conducted and staffed by U.S. Navy officers, civilian employees and crew, with shipyard and manufacturer's representatives along to observe. As before, any deficiencies discovered with the turbine during acceptance trials would be corrected by GE under direction and control of the Navy. Following the acceptance trial, the vessel was commissioned and would typically embark on a "shake-down cruise." During this cruise, the operation of all components of the vessel were further evaluated and tested by Navy personnel under the widest possible range of operating conditions.

21.    During the launching, outfitting and sea trials of the first vessel of a new class, other vessels in the class may be under construction on a trailing schedule. Each and every vessel would go through essentially the same construction, inspection, testing, sea trials and shake-down procedure as described above for the first vessel of the class. All equipment, including the turbines supplied by GE, was built in accordance with U.S. Navy specifications in existence at the time and was approved by the U.S. Navy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 17, 2003.

_David Hobson_

DAVID HOBSON

8



## AFFIDAVIT OF J. THOMAS SCHROPPE IN SUPPORT OF FOSTER WHEELER'S NOTICE OF REMOVAL

I, J. Thomas Schroppe, being under penalty of perjury, declare and say:

1.     I am a 1962 graduate of the New York State Maritime College with a degree in Marine Engineering. For three months in 1962, I worked as a Third Assistant Engineer for American Export Lines. I began my career at Foster Wheeler in 1962 as a Proposal Engineer in the Marine Department. As a Proposal Engineer, I was responsible for taking shipyard specifications and designing a boiler to meet the thermal performance and physical requirements of those specifications. In 1967, I became the Manager of the Proposal Department and reviewed all proposals. In 1969, I was promoted to Vice President of Engineering at which point I supervised both proposal and contract execution activities. From 1975 to 1982, I was President of Foster Wheeler Boiler Corporation. In 1982, I became Managing Director of Foster Wheeler U.K. From 1984 to my retirement in 1999, I was Executive Vice President of Foster Wheeler Power Systems.

2.     I am personally familiar with the degree of supervision and control exercised by the Navy and its agencies in procurement contracts with Foster Wheeler for boilers and auxiliary equipment because I was personally involved in such contracts at all the various stages of development, from inquiry and bid through production, testing, and sea trials and, ultimately, acceptance.

3.     I submit this affidavit to attest to the degree of involvement, supervision, direction and control exercised by the U.S. Navy and its authorized agents and officers in connection with procurement contracts with Foster Wheeler for equipment to be installed aboard U.S. Naval vessels. The following paragraphs describe the contract process from the perspective of Foster Wheeler as the vendor, as well as the levels of interaction between Foster Wheeler and the Navy agents and personnel through the various stages of a given contract.

4.     Foster Wheeler furnished and fabricated marine propulsion boilers and related auxiliary systems for U.S. Navy, Maritime Commission, and Coast Guard ships under contract between Foster Wheeler and the shipyards and/or the United States Navy Department and its authorized agencies, officers and personnel (hereafter collectively referred to as the "Navy").

5.     The Navy was responsible for all phases of the design of a vessel, which was accomplished by the Naval architect. Specifically, the Naval architect would prepare the ship design which involved the entire vessel, including the machinery space, and all performance requirements. In general, the ship design for any given class of ship would be contained in a Ship Specification ("Ship Spec") which covers all aspects of the vessel including the machinery space. As it relates to the boiler, the Ship Spec would cover all boiler operating criteria, performance requirements, and maximum physical dimension of the boiler(s). In general, the Ship Spec was written and prepared by the naval architect and approved by the Navy and, in the course of its projects with the Navy, Foster Wheeler was required to design, fabricate and furnish equipment which complied strictly with the requirements in the Ship Spec.

6.     In addition to the Ship Spec, Foster Wheeler was also obligated to comply with Military Specifications ("Mil Specs") which cover all specific components of the boiler, including

accessories, subcomponents, and materials required to fabricate the boilers and its components.

7.      The normal process by which Foster Wheeler sold marine boilers to the Navy first involved receipt and response to an inquiry from either BuShips (Bureau of Ships) or the shipyard, depending on the Navy's procurement process. The boiler inquiry would be assigned to a proposal engineer at Foster Wheeler's marine department who would review the inquiry, which consisted of the Ship Spec and the associated drawings, for the performance requirements and size limitations of the boiler.

8.      The performance requirements are contained in the specifications, namely MIL-B18381 and the Ship Spec, which must be followed. I must point out that deviations from these specs were not acceptable as the boiler is just one piece of the entire power plant which was designed by BuShips or by a designated naval architecture firm such as Gibbs and Cox. In addition, the Foster Wheeler proposal engineer was aware that these requirements would be tested during the sea trials, so all calculations had to precisely conform with the Ship Spec.

9.      During the proposal phase, Foster Wheeler would prepare design drawings and related materials in conformance with the Ship Spec (which included performance specs and size limitations) and other requirements contained in MIL-B-18381 which was the Mil Spec pertaining to Naval propulsion boilers. I am personally familiar with the MIL-B-18381 as I saw it and referred to it throughout my career at Foster Wheeler. Foster Wheeler would prepare a proposal drawing and proposal specification that would outline the design and scope of material and equipment contained in the proposal. The boiler proposal submitted by Foster Wheeler would incorporate the specific requirements set forth in the Ship Spec and MIL-B18381.

10.     Approximately half way through the proposal process, information is forwarded to Foster Wheeler's estimating department to start to prepare an estimate of the boiler cost. In parallel, the proposal engineer starts calling vendors to obtain quotes for the various boiler accessories such as burners, sootblowers, gage glasses, safety valves, etc. All Navy approved vendors were asked to provide a quotation for the material in accordance with the Mil Spec covering their equipment or product.

11.     The finished boiler proposal consisted of an approximately 25 page booklet, a proposal drawing and an offering letter to the entity requesting a proposal so stating that the offering was in accordance with the Ship Spec and all required Mil Specs.

12.     The boiler proposal would be reviewed by the shipyard with the understanding that the proposed design, prepared specifically for the Navy in accordance with the Ship Spec at issue, conformed to all appropriate specifications stated above. Once final price negotiations were complete, the contract was awarded to Foster Wheeler.

13.     The boiler specifications would provide detailed requirements for the boiler and would always reference the boiler Mil Spec (MIL-B-18381) which dictated very specific material requirements such as:

(a)    Boiler tubes: Type of tube, tube diameter, tube thickness, material, and tensile strength.

(b)    Refractory and Insulation: Specification identified the material, arrangement of various bricks and insulating materials on various boiler walls and provided specific Mil Specs for each type of insulating/refractory material.

(c)    Boiler accessories: All accessories applied to the boiler, such as burners, safety valves, soot blowers, must conform to a specific Navy Mil Spec for each such component.

14.    At receipt of an order the same Foster Wheeler proposal engineer is assigned the project as a contract engineer which will entail a more detailed recalculation of the thermal performance for the boiler. In addition, calculations of all the pressure drops, design of drum de-superheaters and final selection of all boiler accessories are made. All this work will be double checked by the head of engineering. In parallel, the contract engineer will commence discussions with the contract design department who will make all the drawings required for both manufacture, for submission to the shipyard and the Navy for review and approval. Foster Wheeler would not commence production of the boilers until the Navy issued final approval of these contract drawings. The approved drawings prepared during this phase would eventually be incorporated into the technical manuals.

15.    The contract design department also provides the material requisitions to the purchasing department so they may procure materials in accordance with Mil Specs. With regard to procurement of insulating and refractory material, the specific requirements for insulation and refractory items are listed in MIL-B-18381, which then references additional Mil Specs for each specific type of refractory/insulating material required. Foster Wheeler's procurement process would involve the purchasing department contacting the vendor and requesting a quotation for the material. The Foster Wheeler purchase order would reference the appropriate Mil Spec for each item shipped. The vendor, in turn, would supply materials that conformed to the Mil Spec and ship it directly to the shipyard. Finished products such as burners, sootblowers, and all refractory and insulating materials, etc. are shipped direct to the shipyard so they may be incorporated into the final boiler erection. Upon arrival at the shipyard, there would be a receipt inspection to ensure what was on bill of materials was delivered.

16.    During manufacture of the boiler, a Navy resident inspector was present at Foster Wheeler's shops. The Navy inspector would review all fabrication processes, welding procedures, pressure part welding, and all weld x-rays for conformity to Mil Specs. The inspector would also ensure that all materials used at this stage, e.g., steel, flanges, tubes, etc., conformed to applicable Mil Specs. All manufacturing was performed to drawings which had been reviewed and approved by the Navy.

17.     Once individual components (e.g., headers, tubes, pressure parts) were manufactured, inspected by a Foster Wheeler quality control inspector, and inspected and stamped with approval by the resident Navy inspector, the materials/components were moved to the shipping area. At this point, the boiler fabrication was complete, though the boilers were in a "knocked down" condition (unassembled) for shipment. The boiler components and related materials were wrapped and/or boxed in accordance with Mil Specs relating to packaging and shipment of materials, which is also referred to in Mil Spec MIL-B-18381.

18.     The knocked down boilers are then shipped from Foster Wheeler's facility to the shipyard for assembly. For those not familiar with Naval propulsion boilers, they are simply too large and heavy to be shipped assembled. The assembly is done by shipyard workers with a Foster Wheeler employee on site to interpret drawings and answer questions that may arise during the assembly process. Resident Navy inspectors also witness the boiler assembly process.

19.     A critically important inspection item is the hydrostatic test put on the boiler after complete assembly of the pressure parts. This test is a water pressure test of the boiler at 50% over the boiler design pressure. At this point, leaks, even small ones, are not acceptable to the Navy. Formal written acceptance at this stage by the Navy inspector is a requirement. The boilers now sit idle in the ship as the remainder of the engine room and the balance of the ship are being completed. It is at this point that all the engine room piping is connected to the various connections on the boiler. Following the piping tests (shipyard responsibility) the shipyard insulates all piping up to the boiler casings.

20.     Upon completion of the vessel by the shipbuilder, dock trials start to test the various machinery systems in the engine room. The boilers are run at low power since the main turbine cannot be run very fast at the dock because any higher powers would tear the ship loose from the pier. Full power testing is done during sea trials where all aspects of the boiler performance are thoroughly tested. Foster Wheeler would send a service engineer to witness these tests and answer any questions which may arise. Foster Wheeler frequently sent the contract engineer on the first ship of a new class to obtain first-hand data on the boiler performance. Sea Trials were performed on every ship and formal approval by the head Navy inspector was required. Any punch list items which were identified had to be corrected before final acceptance of the boilers.

21.     In addition to the above design, manufacture and testing there remains an obligation by Foster Wheeler to provide technical manuals for the boilers furnished in a given Navy contract. The Navy exercised intense direction and control over all written documentation to be delivered with its naval boilers such as engineering drawings, test reports and other technical data that could be used as needed by shipboard engineering officer during the life of the equipment. The Navy required that every piece of equipment be supplied with a defined number of copies of one or more technical manuals. Navy personnel participated intimately in the preparation of this kind of information and exercised specific direction and control over its contents. These manuals included safety information related to the operation of naval boilers only to the extent directed by the Navy.

22.    Furthermore, the Navy had precise specifications, practices and procedures that governed the content of any communication affixed to machinery supplied by Foster Wheeler to the Navy.  Foster Wheeler would not be permitted, under the specifications, associated regulations and procedures, and especially under actual practice as it evolved in the field, to affix any type of warning or caution statement to a piece of equipment intended for installation onto a Navy vessel, beyond those required by the Navy.

        I declare under the penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct. Executed this 16th day of March, 2006 at Newark, New Jersey.


J. Thomas Schroppe


THE STATE OF NEW JERSEY

ESSEX COUNTY                    )


        Personally appeared before me this        day of March, 2006, J. Thomas Schroppe, who made oath that the statements contained in the affidavit above are true and correct to the best of his knowledge.

        Subscribed and sworn to before me this 10th day of March, 2006. My commission expires 4/1/07

Notary Public        HEDWIG BACHLER
                     A NOTARY PUBLIC OF NEW JERSEY
                     MY COMMISSION EXPIRES APRIL 1, 2007

F

## AFFIDAVIT OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RET.

1.      I am a retired Rear Admiral of the United States Navy. Before joining the Navy in 1942, I received a Bachelor of Science degree in Mechanical Engineering from the College of the City of New York. After joining the Navy, I was ordered to study naval architecture and marine engineering at Massachusetts Institute of Technology (MIT). Later, I completed the United States Post-Graduate School program in Naval Engineering Design. I received a Master of Science in Mechanical Engineering from Harvard University in 1949. I have also studied Design Philosophy and Advanced Stress Analysis at Stanford University. While in the United States Navy, I served as Ship Superintendent and Planning Officer at the Brooklyn Navy Yard between 1942 and 1944, as a Ship Superintendent at the San Francisco Naval Shipyard from 1950 and 1952, and as a Planning Officer at the Assistant Industrial Manager Office in San Francisco from 1952 to 1954. I was promoted to Rear Admiral in 1977 in the Naval Reserve.      I worked as an engineer at General Electric Company between 1946 and 1948. I held the positions of Director of Engineering and Vice-President of Engineering at two major ship building companies between 1969 and 1975. During all these periods I have maintained close contact with the U.S. Navy, including periods of active duty in the Department of Defense and the Naval Sea Systems Command in Washington, D.C. I have been an independent consultant since 1975. I have personal knowledge of the facts contained herein.

2.      I submit this Affidavit to attest to the level of supervision and control by the United States Navy and its officers over every aspect of the design and manufacture of equipment intended for installation on Navy vessels.

3.      During my tenure in the Navy and as Ship Superintendent, I was personally involved with the supervision or oversight of ship alterations and equipment overhauls at the New York Naval Shipyard (formerly the Brooklyn Navy Yard). Any deviation from military specifications of

NJ/130115v1

equipment to be installed on ships would have resulted in significant problems and probable rejection of the equipment. The Navy could not, and did not, permit its contractors to implement any changes because every aspect of every item of equipment had to be: (1) functionally compatible with every other equipment and with available materials from the Navy Supply System; (2) compatible with the shipyard practices, training, tools and capabilities; and (3) consistent with the ability of the crew to maintain the ship during its service when shipyard help was unavailable using materials carried onboard.

4.    In the 1940s and afterward, the Navy had complete control over every aspect of each piece of equipment. Military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings. Drawings for nameplates, texts of instruction manuals, and every other document relating to construction, maintenance, and operation of the vessel was approved by the Navy. This control included the decision of what warnings should or should not be included. Thus, the Navy controlled the decision making with respect to instructions and warnings on every piece of equipment.

5.    Furthermore, the Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment, including turbines. The Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information and any other written information that accompanied a piece of equipment. The Navy determined the nature of hazards to be subject to any precautionary labeling and the content of any such labeling. In short, the Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors.

I declare under penalty of perjury that the foregoing is true and accurate.

Executed this ___ day of October, 2004

Ben J. Lehman, Rear Admiral U.S. Navy, Ret.

Sworn and subscribed to before me
on this ___ day of October, 2004

_____
Notary Public

L. McKAY
Notary Public - State of Nevada
Appointment Recorded in Douglas County
No: 99-36380-5 - Expires June 10, 2007



## AFFIDAVIT OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RETIRED
## IN SUPPORT OF FOSTER WHEELER'S NOTICE OF REMOVAL

I, Ben J. Lehman, understanding and being under the penalty of perjury, declare:

1.      I am a Rear Admiral, Retired, of the United States Navy [U.S. Navy]. I received

notice of my commission as an Ensign in April, 1942 and commenced active duty in the U.S.

Navy on June 1, 1942. Immediately prior to commencing active duty in the U.S. Navy, I

attended the College of the City of New York. I had been a "student engineer" at the Mack

Manufacturing Co. [Mack Trucks] in Allentown, PA and had been enrolled as a special student at

Lehigh University, Bethlehem, PA from June 1941 until January 1942. I returned to the College

of the City of New York in order to complete my course work there and then enter military

service. I had already completed two years of U.S. Army ROTC. On entering active duty, the U.S.

Navy ordered me to study naval architecture and marine Engineering at the Massachusetts Institute

of Technology [MIT]. Later, I was ordered to the U.S. Naval Academy Post-Graduate School at

Annapolis [now the U.S. Navy Post-Graduate School in Monterey, CA]. I received a Master of

Science [SM] from Harvard University in 1949. I studied Design Philosophy and Advanced Stress

Analysis at Stanford University in 1957 and 1958. In the U.S. Navy, I served as a Ship

Superintendent and Dry Docking Officer at the New York Naval Shipyard [formerly the

Brooklyn Navy Yard], between 1942 and 1944, as a Ship Superintendent at the San Francisco

Naval Shipyard from September 1950 to May 1952, and as a Planning Officer at the Assistant

Industrial Manager, San Francisco from 1952 to 1954. In the Navy, I have always been an

Engineering Duty Officer. I was promoted to Rear Admiral in 1977 in the Naval Reserve. I was

employed as an engineer by the General Electric Co. between 1946 and 1958, and by the Bethlehem Steel

Co.'s Shipbuilding Division in 1949 and 1950. I held the positions of Director of Engineering at a major

shipbuilding company in Seattle, WA from 1969 to 1972 and of Vice President of Engineering in

Pascagoula, MS from 1972 to 1975. During all these periods I have maintained close contact with the U.S. Navy. During times of civilian employment, I have had periods of active duty in the Department of Defense [DOD], the Naval Sea Systems Command [NAVSEA] in Washington, D.C., and shipyards. My experience has caused me to be thoroughly familiar with U.S. Navy specifications by means of which the U.S. Navy controlled its contracts and inspection procedures, and thereby controlled its suppliers. Since my retirement in 1982 my specific knowledge of new procedures has decreased. I have been an independent consultant since 1975. I have personal knowledge of the facts herein.

2.      I submit this Affidavit in support of Foster Wheeler's Notice of Removal to attest to the levels of direction, control, and supervision exercised by the U.S. Navy over the design and manufacture of equipment, including boilers and their auxiliary equipment [collectively referred to as "boilers"] designed and constructed for installation on ships of the U.S. Navy.

3.      During my service in the U.S. Navy as a Ship Superintendent, I was personally involved with supervision and oversight of ship's overhauls and alterations. I was fully aware that only boilers especially designed and built for the propulsion of U.S. Navy combat vessels, including Foster Wheeler boilers, could be installed. These were designed and manufactured in accordance with detailed specifications written, approved, and issued by the U.S. Navy, specifically NAVSEA or its predecessors, including the Bureau of Engineering.

4.      The U.S. Navy chain of command concerning ship construction comprised several layers. The Secretary of the Navy [subject to the President and Congress] had the ultimate authority related to contractual and technical control. An Under Secretary was directly concerned with ship acquisitions. The Under Secretary position has now been eliminated, and that authority now rests with the Chief of Naval Operations who provides NAVSEA with the

desired ship characteristics, and oversees its performance. In the 1930s, Foster Wheeler, as a boiler and heat exchanger manufacturer, was under the cognizance of the Bureau of Engineering. The representative of that Bureau at the plant was an Inspector of Naval Machinery. The Bureau of Engineering and the Bureau of Construction and Repair were combined in 1940 to create the Bureau of Ships: for a time Approvals were required from both the Inspector of Machinery and the Supervisor of Shipbuilding for the lead ships of a class. Later, the Inspectors of Naval Machinery were renamed Inspectors of Naval Material. About 1958, the Bureau of Ordnance was merged with the Bureau of Ships to form NAVSEA. As a reduction in the pace of shipbuilding continued, routine inspection responsibilities were assumed by a new organization: the Defense Contract Administration Services Agency [DCASA]. This organization had many responsibilities, but lesser technical qualifications. Technical questions were referred to the Bureaus [Commands] in Washington. Throughout all of these reorganizations there were no changes in the ultimate authorities or the responsibilities of those authorities. Suppliers of equipment and the builders of ships have had the U.S. Navy's acceptance of their products determined by representatives of different organizations at different times but NAVSEA or its predecessors always had the ultimate authority and the professional competence to accept or reject them.

5.    Under NAVSEA, as under its predecessors, the U.S. Navy's shipbuilding and acquisition of equipment for the ships comprised several levels of authority. Detailed technical control over ship design, construction, repair, and inspection was in NAVSEA. The Commander of Naval Supply Systems Command [NAVSUP] had contractual control of some procurements. Each of these two organizations had oversight responsibilities regarding, among other things, boilers manufactured for U.S. Navy vessels. Compliance with the specifications and standards was directly monitored by Inspectors of Naval Machinery under both these divisions: those

under NAVSUP generally worked on site at the supplier's [in this case Foster Wheeler's] manufacturing facilities and Machinery Superintendents or Inspectors of Naval Machinery carried out their responsibilities at the shipbuilding yards. Moreover, it was common in my experience for technical personnel from the Propulsion Equipment Groups of NAVSEA to inspect the manufacturing and quality assurance processes at supplier's plants and the boiler erection and inspection procedures at the shipyards. In my experience, it was machinery inspectors who exercised primary, front line control over the work performed for the Navy by suppliers such as Foster Wheeler in the production of boilers and other equipment. The Inspectors of Naval Machinery [or those with other titles who succeeded them] were responsible for assuring that contractors such as Foster Wheeler complied with the contract specifications every detail. Further, the Inspectors of Naval Machinery would report to their superiors any violations of, or failures to comply with specifications, refuse to apply their stamp of approval, and not authorize shipment. This was true whether the installation was to be done by government shipyards or government contract shipyards.

5.    The U.S. Navy retained the "final say" over the design of any piece of equipment, and made the ultimate decisions, whether engineering or contractual.

6.    Further, I can attest that the military specifications for boilers and other equipment intended for use on vessels of the U.S. Navy, known as "MilSpecs", were drafted, approved, and maintained by the U.S. Navy, specifically NAVSEA or its predecessors, to encompass all aspects of shipboard equipment, including the material requirements.

7.    These contract specifications reflected the state of the art and the special needs of vessels destined for combat. NAVSEA maintained and controlled the MilSpecs because it had direct contact with the forces afloat and the shipyards, and therefore superior knowledge of the

demands and requirements of vessels ready for combat, and the availability of processes and materials.

8.    The U.S. Navy's unique specifications for boilers were communicated to boiler suppliers such as Foster Wheeler when the U.S. Navy, either directly or through its contractors, issued a negotiated contract or a Request for Proposal for equipment. The U.S. Navy specifications included the nature of any communication affixed to boilers or other equipment supplied to the U.S. Navy.

9.    The U.S. Navy had complete control. It could not, and did not, permit its contractors to implement any changes. Every aspect of every item needed to be controlled because:

a.    it had to be consistent with the ability of the crew to operate the ship, especially on its combat missions;

b.    it had to be compatible with the ability of the crew to maintain the ship and perform emergency repairs during its service using materials and parts carried on board when shipyard assistance was not available;

c.    every item had to be functionally compatible, fit in the space available, and be maintainable and operable with materials available from the U.S. Navy's supply system.

10.    The U.S. Navy had complete control over every aspect of every piece of equipment. Military specifications governed every significant characteristic of the equipment used on U.S. Navy ships, including the instructions and warnings. Drawings for nameplates, the texts of instruction manuals, and every other document relating to construction, maintenance, and operation of the vessel was approved by the U.S. Navy. This control included the decision of which warnings should or should not be included. Thereby, the U.S. Navy controlled the decisions with regard to instructions and warnings on every piece of equipment. The U.S. Navy would not, and could not, permit any equipment manufacturer or supplier to interfere with the Navy's mission by placing warnings on any equipment [or in any instructions or manuals which accompanied the

equipment] on any U.S. Navy ships or in any shipyards in which U.S. Navy ships were built or repaired that might cause Sailors or workers to deviate from their mission or require the U.S. Navy to devote scarce resources to programs it deemed not essential, in its unilateral view.

11.    In addition to specifications for the design and manufacture of the equipment itself, the U.S. Navy also had detailed specifications that governed the form and content of the written materials to be delivered with the equipment, including boilers, supplied to the U.S. Navy. The U.S. Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information and any other written information that accompanied or related to any piece of equipment. The U.S. Navy determined the nature of hazards to be subject to any precautionary labeling and the content of such labeling. In short, the U.S. Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors.

12.    The U.S. Navy would never permit a supplier to suggest, advise, or require any actions that would be disruptive to the normal operation of the ship in its primary function of defending our Country. Procedures for operation were taught and enforced by officers of all ranks, from Petty Officers to Captains. Any written material regarding procedures for working around boilers that differed would have interfered with the normal and necessary operations of U.S. Navy ships. Indeed, in its specifications for manuals the U.S. Navy specifically limited warning information to items and events dealing with the operation of equipment. By definition, the application or removal of insulation would not have been included.

13.    Asbestos was rampant throughout U.S. Navy ships. Sailors and civilian personnel were exposed at all times when they were aboard ships regardless of where they were stationed or where they worked. In order to protect all these individuals from exposure to asbestos, the U.S.

Navy would have had to allocate scarce resources to provide respiratory protection for all sailors and workers every hour of every day that they were on board. Implementing wet down procedures and creating containment areas would also have been required to implement effective industrial hygiene programs. The U.S. Navy made a conscious decision on allocation of its resources in light of its knowledge of the hazards of asbestos and its mission to protect our Country. The U.S. Navy conducted extensive research concerning the hazard of exposure to asbestos starting in the 1930's. In the early 1940's, the Navy's Bureau of Medicine and Surgery, in coordination with the U.S. Maritime Commission, set standards based on the report of Dr. Drinker and Fleischer and Marr. Through its participation in government programs and conferences into the 1980's, the Navy stayed abreast of the latest information, including the results of research. The U.S. Navy made a conscious and informed decision about how asbestos would be used on its ships and how exposures would be controlled, if at all, on its ships.

14.    The U.S. Navy would not have allowed its equipment suppliers, such as Foster Wheeler, to affix any warning related to any asbestos hazards on their equipment. This would have included boilers. Further, the U.S. Navy would not have allowed Foster Wheeler to place any warnings related to asbestos hazards in any written material provided by Foster Wheeler to the U.S. Navy or to a U.S. Navy contractor in accordance with its contracts, including its technical and operations manuals. To do so would have interfered with the U.S. Navy's mission and control of its ships and personnel.

I declare under penalty of perjury that the foregoing is true and correct, and that if called as a witness, I could competently testify to the foregoing facts, all of which are within my own personal knowledge.



Ben J. Lehman, Rear Admiral, U.S. Navy, Ret.

Before me, the undersigned officer, personally appeared Ben J. Lehman, Rear Admiral, U.S. Navy, Ret. known to me to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal acknowledge.

Executed this ___12th___ day of ___July___ 2007.

On this 12 day of 07, 2007, before me, a Notary Public,

___Josh Martin___

MY COMMISSION EXPIRES ___August 28, 2010___

```
JOSH MARTIN
NOTARY PUBLIC
STATE OF NEVADA
APPT. No. 06-109087-5
MY APPT. EXPIRES AUGUST 28, 2010
```



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

ROBERT NESBIET,

               Plaintiff,

   - against -

GENERAL ELECTRIC CO., et al.,

               Defendants.

------------------------------------------------------------X

<u>OPINION AND ORDER</u>

04 Civ. 9321 (SAS)

SHIRA A. SCHEINDLIN, U.S.D.J.:

        On October 26, 2004, Robert Nesbiet ("Nesbiet") sued General Electric Company ("GE") and other defendants in New York state court alleging, among other things, that he was exposed to asbestos-containing products while employed at the Brooklyn Navy Yard, where he worked on the USS Missouri between 1943 and 1944. Nesbiet is suing GE solely on the theory that it failed to warn of the dangers relating to asbestos used as insulation in marine steam turbines manufactured by GE. On November 29, 2004, GE filed a timely notice of removal asserting federal jurisdiction under the federal officer removal statute.[1] Nesbiet now moves to remand this action to state court.[2]

---

[1]    *See* 28 U.S.C. § 1442(a).

[2]    In addition, GE has moved to stay all proceedings in this Court pending a decision by the Judicial Panel on Multidistrict Litigation on whether to transfer and consolidate this action pursuant to 28 U.S.C. § 1407. This case is

# I. BACKGROUND

## A.    Plaintiff's Allegations

Nesbiet's exposure to asbestos occurred, in part, during his employment at the Brooklyn Navy Yard, where he worked as a welder and shipfitter during World War II.[3] In October, 2004, Nesbiet was diagnosed with mesothelioma, a cancer of the lining of the lungs caused by exposure to asbestos.[4] GE has confirmed that it manufactured marine steam turbines that were installed on the USS Missouri, a Navy ship that Nesbiet helped construct.[5] Nesbiet has stated that the insulation on these turbines was a source of his asbestos exposure.[6] He alleges that GE failed to provide any warnings regarding asbestos on its

---

scheduled to be considered for transfer to MDL 875, *In re Asbestos Products Liability Litigation*, on March 31, 2005.

[3]    *See* Plaintiff's Responses to Defendant's Fourth Amended Standard Set of Interrogatories and Request for Production of Documents, Ex. C to Certification of Michael A. Tanenbaum, Counsel to GE, in Support of Defendant's Memorandum of Law ("Tanenbaum Cert."), at 24.

[4]    *See id.* at 9.

[5]    *See* GE's Notice of Removal ("GE Not.") ¶ 6.

[6]    *See* Plaintiff's Memorandum of Law in Support of His Motion to Remand at 5 ("Nesbiet Mem.").

-2-

turbines.[7] Nesbiet's only claim against GE is for failure to warn about the dangers of asbestos.

## B.    Grounds for Removal

In its notice of removal, GE avers that "in the manufacture and sale of turbines and other equipment for the U.S. Navy, including all aspects of warnings associated with those turbines and equipment, GE was acting under an officer or agency of the United States within the meaning of 28 U.S.C. § 1442(a)(1)."[8] In support of removal, GE has proffered the following evidence.

### I.    David Hobson's Affidavits

*First*, GE has submitted four affidavits of David Hobson ("Hobson"), a former GE employee.[9] Hobson began his employment with GE in 1969 and over the course of the following twenty-seven years, "had frequent and extensive business dealings on behalf of GE with commissioned officers and civilian employees of the United States Navy in connection with the Navy's purchase and

---

[7]    *See* Weitz & Luxenberg, P.C., Amended Standard Asbestos Complaint for Personal Injury No. 7, Ex. A to Tanenbaum Cert., ¶ 173.

[8]    GE Not. ¶ 6.

[9]    *See* 10/17/03 Affidavit of David Hobson; 3/31/04 Affidavit of David Hobson ("Hobson 2"); 10/6/04 Affidavit of David Hobson ("Hobson 3"); 2/4/05 Affidavit of David Hobson ("Hobson 4"), Exs. 1-4 to Defendant's Memorandum of Law in Opposition to Plaintiff's Motion to Remand ("GE Opp.").

-3-

use of marine steam turbines from GE."[10] Prior to his employment by GE, Hobson worked as an engineer at a shipyard and on steam ships, from 1965 until 1969.[11]

The Hobson affidavits show that GE manufactured and supplied turbines for U.S. Navy ships under contracts between GE and the Navy Department or contracts between GE and shipyards that had themselves contracted with the Navy Department.[12] The Navy Department administered these contracts through Navy Sea Systems Command, whose personnel exclusively developed ship designs and plans, as well as comprehensive and detailed guidelines and specifications for all equipment on U.S. Navy ships.[13] This portion of the affidavits is uncontroverted.

Nesbiet strenuously objects, however, to those portions of Hobson's affidavits regarding the Navy's control over warnings and, more specifically, whether the Navy prevented GE from providing warnings on the dangers of asbestos. Hobson declares, in relevant part:

> [T]he Navy had precise specifications as to the nature of any information that was to be affixed to equipment supplied to the

---

[10]    Hobson 2 ¶ 3.

[11]    See id. ¶ 1.

[12]    See id. ¶ 6.

[13]    See id.

-4-

Navy by GE. Under the Navy's specifications and procedures, as well as under actual Navy practice as it evolved in the field, GE would not have been permitted to affix any type of warning or caution to a piece of equipment intended for installation onto a naval vessel, beyond those expressly specified by the Navy. The Navy also had precise specifications as to the nature and contents of all written materials that were to be delivered with naval turbines. . . . These [materials] included safety and hazard information only to the extent directed by the Navy. [14]

Nesbiet argues that this and other similar statements contained in Hobson's affidavits could not possibly be based on Hobson's personal knowledge and, in any case, have no basis in fact. [15] When deposed concerning the first two of his affidavits, Hobson admitted that he has no personal knowledge concerning the relationship between GE and the Navy prior to 1965; mentoring from the previous generation of GE engineers was his only source of knowledge with respect to the relevant time period. [16] There is no indication that this mentoring included the subject of the Navy's specifications, procedures or practice concerning asbestos-related warnings during World War II. [17] It follows that Hobson lacks personal

---

[14]    Hobson 3 ¶¶ 4-5.

[15]    Nesbiet Mem. at 7-16.

[16]    *See* Continued Deposition under Oral Examination of David Hobson on July 21, 2004, Ex. B. to Affidavit of Bryan Belasky ("Belasky"), Counsel to Nesbiet, at 217-18.

[17]    After his deposition, Hobson submitted two additional sworn affidavits: Hobson 3 and 4. In the first of these, Hobson asserts that "[b]y virtue

-5-

knowledge as to the Navy's control over such warnings when Nesbiet was

working on the USS Missouri. Therefore, to the extent that Hobson's affidavits

suggest that during the relevant time period the Navy prohibited warnings

concerning the dangers of asbestos, the statements are without foundation — and

therefore inadmissible — as being beyond the scope of Hobson's personal

knowledge and experience.[18]

### 2. Admiral Ben J. Lehman's Affidavit

*Second*, GE has submitted the affidavit of Ben J. Lehman

("Lehman"), a retired Rear Admiral of the U.S. Navy, who served as a ship

---

of the knowledge I have obtained over the course of my career concerning the historical practice of GE and the U.S. Navy with regard to marine steam turbines, I can state that the practices described in my October 17, 2003 affidavit [Hobson 2] concerning the U.S. Navy's control and direction related to marine steam turbines would have been applicable at least as far back in time as World War II." Hobson 3 ¶ 2. This assertion is insufficient to establish personal knowledge with regard to whether a particular kind of warning was forbidden over twenty years prior to the start of Hobson's career.

[18]   Nesbiet has requested an opportunity to depose Hobson concerning his last two affidavits. This request was granted. As of the date of this opinion, however, Nesbiet has not yet been able to further depose Hobson. Nonetheless, because this Court has concluded that Hobson cannot offer competent evidence concerning the Navy's control over asbestos-related warnings during the relevant time period, Nesbiet is in no way prejudiced by his inability to depose Hobson a second time.

-6-

superintendent for repairs at the Brooklyn Navy Yard between 1942 and 1944.

In that capacity, Lehman "was personally involved with the supervision or oversight of ship alterations and equipment overhauls."[20] Lehman's affidavit states, in relevant part:

> In the 1940s and afterward, the Navy had complete control over every aspect of each piece of equipment. Military specifications governed every characteristic of the equipment used on Navy ships, including the instructions and warnings. . . . This control included the decision of what warnings should or should not be included. . . . Furthermore, the Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment, including turbines. The Navy was intimately involved with and had final approval of all . . . safety and hazard information and any other written information that accompanied a piece of equipment. The Navy determined the nature of the hazards to be subject to any precautionary labeling and the content of any such labeling. In short, the Navy dictated every aspect of the . . . warnings associated with its ships and did not permit deviation from any of its contractors.[21]

The affidavit thus raises the inference that GE did not provide a warning concerning the dangers of asbestos because the Navy did not permit any such warning.

---

[19]    See Affidavit of Admiral Ben J. Lehman ("Lehman Aff."), Ex. 6 to GE Opp., ¶ 1.

[20]    Id. ¶ 3.

[21]    Id. ¶¶ 4-5.

-7-

statements contained in his affidavit. Based on this deposition, plaintiff contends that Lehman, like Hobson, has no personal knowledge of the relevant facts.[22] In that deposition, however, plaintiff did not attack Lehman's competence to make the statements in his affidavit. Rather, plaintiff attacks Lehman's conclusion by asserting that he lacks direct knowledge of warnings or instructions on GE's marine steam turbines in the 1940s. While the deposition reveals that Lehman has no direct knowledge as to whether the Navy specifically prohibited GE, or other manufacturers, from providing warnings about asbestos,[23] Lehman made no such assertion in his affidavit. But, as stated earlier, his affidavit raises the *inference* that the Navy prohibited warnings about asbestos because, based on Lehman's knowledge and experience, the Navy exercised *complete* control over *all* warnings placed on equipment or in accompanying technical manuals by its contractors. By virtue of the position he occupied at the Brooklyn Navy Yard during the relevant time period, Lehman is competent to make the statements contained in his affidavit.

Nesbiet further contests the factual basis for Lehman's affidavit by

---

[22] *See* 3/24/05 Letter of Belasky to the Court, at 1.

[23] *See* Deposition of Ben Lehman at 32, 77-78, 103-04.

-8-

contents of instruction manuals for electrical and mechanical equipment,[24] which

Nesbiet contends "imposed an affirmative requirement to warn on contractors such

as GE since at least the 1950s and possibly even earlier."[25] However, Nesbiet has

mischaracterized this so-called requirement. For example, the earliest of these

milspecs, dated October 20, 1952, states that an instruction manual "shall contain

data such as the following: (a) Safety notice (where high voltages or special

hazards are involved) (see figure 9)."[26] "Figure 9" itself consists of detailed

instructions on how to safely handle equipment that involves high voltages.[27] If

anything, the milspec requires that the manufacturer provide safety instructions,

such as those regarding high voltages, *as dictated by the Navy*. Moreover, the

---

[24]     *See* Military Specifications, MIL-M-15071A-G, Exs. C through I to Affidavit of Bryan Belasky ("Belasky Aff."), Counsel to Nesbiet.

[25]     Nesbiet Mem. at 15. Nesbiet proffers that he has been unable to locate the milspec that was in force during WWII. *See id.* at 16 n.5.

[26]     Interim Military Specification, MIL-M-15071A ("1952 Milspec"), Ex. I to Belasky Aff., at 5. The second oldest of the milspecs submitted by Nesbiet, dated August 18, 1954, contains identical language to that found in the 1952 milspec. *See* Military Specification, MIL-M-15071B, Ex. H to Belasky Aff., at 6.

[27]     *See* 1952 Milspec at fig. 9. (stating, for example, "MAKE SURE YOU ARE NOT GROUNDED whenever you are adjusting equipment or using measuring equipment. . . . In general, USE ONE HAND ONLY when servicing live equipment.").

-9-

approval of the Navy.[28]   Therefore, these milspecs appear to support, rather than undercut, Lehman's affidavit.

In sum, Lehman's affidavit establishes, for the purposes of this motion, that the Navy controlled the nature of warnings to be included on all equipment (or in the accompanying technical manuals) to be installed on its ships. This evidence in turn supports the inference that no warnings appeared on the turbines or in the written materials because the Navy prohibited them.

### 3.    Dr. Lawrence Stillwell Betts's Affidavit

*Third*, GE has submitted the affidavit of Lawrence Stillwell Betts ("Betts"), a medical doctor and retired U.S. Navy Captain.  During his Navy career, which began in 1971 and ended in 2001, Betts became a "qualified surface warfare medical department officer," in which capacity he became "generally familiar with the industrial products that were used by the Navy."[29]  Through his training and experience, Betts is also familiar with "the history and practice of the

---

[28]    *See id.* at 4 ("Prior to the printing of the final instruction books, a preliminary instruction book shall be prepared and submitted in duplicate to the bureau or agency concerned via the Government inspector for approval.").

[29]    Affidavit of Lawrence Stillwell Betts ("Betts Aff."), Ex. 5 to GE Opp., ¶ 1; Curriculum Vitae of Lawrence Stillwell Betts, Ex. A to Betts Aff., at 2-3.

time."[30] Betts has supported his conclusions by attaching to his affidavit numerous journal articles, reports, and other documents dating back to before World War II.

Betts's testimony indicates that the Navy's knowledge of the health hazards associated with the use of asbestos aboard Navy vessels during the 1940s represented the state-of-the-art.[31] Consequently, according to Betts's affidavit, GE could not have possessed any information regarding the dangers posed by the use of asbestos-containing products in marine steam turbines that was not already known by the U.S. Navy.[32]

## II. APPLICABLE LAW

Section 1442(a) of Title 28 provides, in relevant part:

A civil action or criminal prosecution commenced in a State court against any of the following may be removed by them to the district of the United States for the district and division embracing the place wherein it is pending:
(1) The United States or any agency thereof or any officer (or any other person acting under that officer) of the United States or of any agency thereof, sued in an official capacity for any act

---

[30] *Id.* ¶ 2.

[31] *See id.* ¶ 31.

[32] *See id.* ¶¶ 30-31.

under color of such office.

This statute overcomes the well-pleaded complaint rule by providing a method to remove a case brought in state court against a federal officer, or any person acting under a federal officer, despite the absence of a federal cause of action.[33]  The Supreme Court has noted that one of the purposes of the federal officer removal statute is to ensure that a federal court will adjudicate the validity of a defendant's official immunity defense.[34]  To remove a state court action under the statute, a private party must establish that (1) it has a colorable federal defense, (2) it acted under the direction of a federal agency or officer, and (3) there is a causal nexus between the claims and the conduct performed under the color of federal office.[35]

A defendant seeking removal bears the burden of demonstrating

---

[33]    See *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999).

[34]    *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981).

[35]    See *id.*; *Mesa v. California*, 489 U.S. 121, 124-25, 134-36 (1989).  A corporation is a "person" within the meaning of section 1442(a).  *See, e.g., Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998); *McGillick v. World Trade Ctr. Props., LLC*, No. 04 Civ. 3747, 2004 WL 2049260, at *2 (S.D.N.Y. Sept. 13, 2004); *Isaacson v. Dow Chem. Co.*, 304 F. Supp. 2d 442, 447 (E.D.N.Y. 2004); *Arness v. Boeing N. Am., Inc.*, 997 F. Supp. 1268, 1272 (C.D. Cal. 1998); *Good v. Armstrong World Indus.*, 914 F. Supp. 1125, 1127-28 (E.D. Pa. 1996).

-12-

federal subject matter jurisdiction. Although federal courts generally construe the removal statutes narrowly, remanding doubtful cases to state court,[37] the Supreme Court has emphasized that "the federal officer removal statute is not narrow or limited."[38] Indeed, "the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'"[39] Furthermore, "it is axiomatic that the right of the states, consistently with the Constitution and the laws of the United States, to make and enforce their own laws is equal to the right of the federal government to exert exclusive and supreme power in the field that by virtue of the Constitution belongs to it. The [federal officer] removal statute . . . is to be considered with highest regard for such equality."[40]

The first requirement for federal officer removal — a colorable federal defense — is broadly construed. "We . . . do not require the officer

---

[36]    See California Pub. Employees' Ret. Sys. v. WorldCom, Inc., 368 F.3d 86, 100 (2d Cir. 2004).

[37]    See Syngenta Crop Prot., Inc. v. Henson, 537 U.S. 28, 31 (2002); Somlyo v. J. Lu-Rob Enters., Inc., 932 F.2d 1043, 1045-46 (2d Cir. 1991).

[38]    Willingham v. Morgan, 395 U.S. 402, 406 (1969) (quotation marks omitted).

[39]    Manypenny, 451 U.S. at 242 (quoting Willingham, 395 U.S. at 407).

[40]    State of Colorado v. Symes, 286 U.S. 510, 518 (1932).

-13-

virtually to win his case before he can have it removed. Thus, a defense may be colorable even if the court ultimately rejects it.[42] "[A]t the removal stage, it is not the Court's role to assess the validity of a particular defense. The Supreme Court made it clear in [*Willingham v. Morgan*[43]] that the phrase 'under color of . . . office' allows removal even if, on the record then existing, it could not be said that 'the officers had a clearly sustainable defense.'"[44]

A defendant meets the second requirement — acting under the direction of a federal officer — by showing a "substantial degree of direct and detailed federal control over the defendant's work."[45] By contrast, a person or corporation establishing only that the relevant acts occurred under the general auspices of a federal agency or officer is not entitled to removal under section

---

[41]    *Jefferson County*, 527 U.S. at 431 (quoting *Willingham*, 395 U.S. at 407).

[42]    *See id.*

[43]    395 U.S. 402.

[44]    *Reiser v. Fitzmaurice*, No. 94 Civ. 7512, 1994 WL 54326, at *3 (S.D.N.Y. Feb. 8, 1996) (alteration in original). *See also Symes*, 286 U.S. at 519 (when a defendant seeks removal pursuant to the federal officer removal statute, "no determination of fact is required but it must fairly appear from the showing made that [the defendant's removal] claim is not without foundation and is made in good faith").

[45]    *Isaacson*, 304 F. Supp. 2d at 447.

-14-

§ 1442(a)." Courts generally have not found jurisdiction where the government

officer did not directly require a purported agent to take specific actions."[47]

   Finally, to satisfy the third requirement — the existence of a causal

nexus — the defendant must show that the state lawsuit "has arisen out of the acts

done by [the defendant] under color of federal authority and in enforcement of

federal law."[48]  In the context of a failure to warn claim, the defendant must

establish that the government's control over warnings directly interfered with the

defendant's ability to fulfill its state law obligation to warn of safety hazards.[49]

## III.  DISCUSSION

---

[46] *See Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 947 (E.D.N.Y. 1992); *Good*, 914 F. Supp. at 1128.

[47] *McGillick*, 2004 WL 2049260, at *3.

[48] *Mesa*, 489 U.S. at 131-32.

[49] *See Freiberg v. Swinerton & Walberg Prop. Servs., Inc.*, 245 F. Supp. 2d 1144, 1155 (D. Colo. 2002) ("What [the defendants] must establish for purpose of . . . § 1442(a)(1) is that the government authority under which they worked required them to act as they did.  For purposes of [p]laintiff's failure to warn claims . . . [the defendants] must establish [that the government's] direction and control of their activities directly interfered with their ability to fulfill their state law obligation to warn employees of safety hazards."); *Faulk v. Owens-Corning Fiberglass Corp.*, 48 F. Supp. 2d 653, 663 (E.D. Tex. 1999) (holding that the causal nexus requirement of the federal officer removal statute was not satisfied "[b]ecause the federal government provided no direction or control on warnings when using asbestos [and] did not prevent [d]efendants from taking their own safety precautions heeding state-law standards").

GE asserts the military contractor defense.[50] This defense shields contractors from liability under state tort law for defects in military equipment supplied to the United States when "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."[51] In the context of a failure-to-warn claim, the Second Circuit has held that in order to satisfy the first element of the military contractor defense, the defendant must show that the government itself dictated or otherwise controlled the content of the warnings meant to accompany the product.[52]

In order to satisfy the first prong of section 1442(a), GE must demonstrate merely that its claim to the military contractor defense is "colorable." GE has met this burden. *First*, the Lehman affidavit establishes for the purposes of this motion that the Navy's specifications controlled all aspects of the design

---

[50]    *See* GE Mem. at 12.

[51]    *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988). *See also Grispo v. Eagle-Picher Indus., Inc.*, 897 F.2d 626, 629 (2d Cir. 1990) (holding that the *Boyle* test may apply to a state law failure-to-warn claim).

[52]    *See Grispo*, 897 F.2d at 630.

and manufacture of marine steam turbines, including the nature of warnings to be affixed to or included with these turbines.[53] *Second,* Lehman asserts that any deviation from these specifications would likely have resulted in rejection of the equipment.[54] This proffer is sufficient, for the purpose of the "colorable defense" prong, to satisfy the requirement that the equipment and accompanying warnings, if any, conformed to the Navy's specifications. *Third,* Betts's affidavit establishes that the Navy's knowledge of the dangers of asbestos on board its ships was state-of-the-art and, therefore, the Navy would have known of any dangers that were known to GE.[55] Thus, GE has shown it has a colorable federal defense.

> B.    "Acting Under" and "Causal Nexus" Requirements

As stated earlier, GE's proffer has established that the Navy determined the nature of warnings to be included on the turbines and in the accompanying technical manuals and, furthermore, did not permit contractors to deviate from any of its specifications. This evidence in turn raises an inference that GE's alleged failure to warn of the dangers of asbestos resulted from the Navy's prohibition of any such warning. Nesbiet has not effectively rebutted this

---

[53]    *See* Lehman Aff. ¶¶ 4-5.

[54]    *See id.* ¶¶ 3, 5.

[55]    *See* Betts Aff. ¶ 31.

-17-

inference with any evidence of his own. In fact, the intispecs submitted by Nesbiet support rather than undermine GE's evidence. GE's proffer thus establishes, for the purposes of this motion, that (1) the Navy exercised a substantial degree of direct and detailed control over GE's provision of warnings and (2) the Navy's control over warnings directly interfered with GE's ability to fulfill its state law obligation to warn about the dangers of asbestos. GE has therefore satisfied "acting under" and "causal nexus" requirements under section 1442(a).[56]

Nesbiet suggests that in order to meet the "causal nexus" requirement GE must provide direct evidence that the Navy "specifically prohibited it from warning about asbestos."[57] This is more than GE is required to do. The Supreme Court has admonished, "[j]ust as requiring a 'clearly sustainable defense' rather than a colorable defense would defeat the purpose of the removal statute . . . so

---

[56]    See Carter v. Acands, Inc., No. 3:02-CV-00009, 2002 WL 31682352, at *4 (E.D. Tex. June 27, 2002) (holding in a case that included a failure-to-warn claim against a manufacturer of turbines for the Navy that the "acting under" requirement of the federal officer removal statute was satisfied because the Navy had ultimate control over warnings affixed to equipment or included in the accompanying written materials); Madden v. Able Supply Co., 205 F. Supp. 2d 695, 702 (S.D. Tex. 2002) (stating in a case that included a failure-to-warn claim against a manufacturer of turbines for the Navy that "any warnings promulgated (or not promulgated) with respect to the turbines were governed by Navy guidelines. Thus, the causal nexus is axiomatic.").

[57]    Reply Memorandum of Law in Further Support of Plaintiff's Motion to Remand at 5.

-18-

case to the Eastern District of Pennsylvania is moot. The Clerk of the Court is directed to close these motions (docket # 5 and # 7).

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            March 28, 2005

**Appearances**

For Plaintiff:

Bryan Belasky, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane
New York, NY 10038
(212) 558-5500


For Defendant:

Michael A. Tanenbaum, Esq.
Sedgwick, Detert, Moran & Arnold, LLP
Three Gateway Center, 12th Floor
Newark, NJ 07102
(973) 242-0002



```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 3/1/2007
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

TALBOT P. FRAWLEY and JOAN
FRAWLEY,

                      Plaintiffs,                                    06 Civ. 15395 (CM)

       -against-

GENERAL ELECTRIC COMPANY, et al.,

                      Defendants.
--------------------------------------------------------------x

## MEMORANDUM ORDER

McMahon, J.:

       On November 15, 2006, plaintiffs Talbot P. Frawley and his wife Joan filed this diversity
action in the New York State Supreme Court, Index No. 117089-06, alleging that Talbot
Frawley's exposure to asbestos during various times in his working life had injured his lungs,
causing him to suffer from the life-threatening illness mesothelioma.

       The complaint that was filed was a *pro forma* complaint, which contained specific
allegations only against Exxon Mobil Corporation. In keeping with a procedure devised by the
New York State Supreme Court for the efficient management of asbestos cases, the allegations
against all the other defendants are found in a form complaint that is incorporated by reference at
the end of the complaint to which the above-noted index number was assigned by the County
Clerk. The First, Second, Third and Fourth Causes of Action in that complaint (known as
NYAL – Weitz & Luxenberg, P.C. Standard Asbestos Complaint for Personal Injury No. 7,
hereinafter "W&L Cplt. No. 7") carve out of their general allegations claims relating to any
"asbestos exposures which are alleged to have occurred aboard any military vessel or vehicle, or
at any shipyard or on or at any governmental facility or location." (Riegel Aff. Ex. 2 – W&L cplt.
No. 7). The claims so excepted – all of which arise under state law – include claims for negligent
failure to use products other than asbestos in the design and manufacture of the item to which
plaintiff was exposed (¶ 169 of the First Cause of Action); negligent failure to design products
containing asbestos in a way that prohibits or minimizes the release of airborne dust and fibers (¶
170 of same); negligent design and manufacture of the product to which the plaintiff was exposed
(¶ 172 of same ); breach of express and implied warranty (Second Cause of Action); placing an
inherently defective product in the stream of commerce (Third Cause of Action); and the entire
Fourth Cause of Action except insofar as it alleges a "failure to warn" claim. (I should note that
the aspect of the First Cause of Action that was not carved out for exposures occurring, *inter
alia*, on military vessels is a failure to warn claim as well). Thus, the only claims alleged against

companies in connection with exposure to asbestos on military vessels are failure to warn claims (First and Fourth Causes of Action) and a claim for maintaining an unsafe workplace (Fifth Cause of Action).

Defendant General Electric Corporation ("General Electric" or "GE") filed a Notice of Removal on December 22, 2006. General Electric relied on the "federal officer" removal statute, 28 U.S.C. § 1442(a)(1), invoking that statute because it has been held to protect federal contractors working to specifications in federal contracts. One of plaintiffs' allegations, as identified in a response to an interrogatory answered on November 20, 2006,[1] is that plaintiff was exposed to asbestos while working as a civilian employee of the United States Navy. It appears that plaintiff worked on two ships, the U.S.N.S. Upshur and the U.S.N.S. General Maurice Rose, both of which carried asbestos-containing steam turbines built by GE pursuant to government contract. Because W&L Cplt. No. 7 did not exempt exposures on military vessels from its claims, GE contended, it was entitled to remove the case to this court.

The Notice of Removal was not filed within thirty days of the complaint and was not joined by any other defendant. General Electric maintains that it could not have discerned from the allegations of the original complaint that plaintiff was alleging asbestos exposure on naval vessels prior to receiving the response to its interrogatory, and argues that removing the case within thirty days of receipt of the interrogatory response was proper. Plaintiffs do not challenge this assertion, and after reviewing a copy of W&L Cplt. No. 7, it is quite apparent that the real substantive allegations relating to plaintiff Frawley's asbestos exposure is found in the answers to interrogatories, which specify where he worked and when. Removal pursuant to the federal officer statute, of course, does not require the consent of all defendants. See In re Franklin Nat'l Bank Sec. Litig., 532 F.2d 842, 846 (2d Cir. 1976); see also Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1253 (9th Cir. 2006).

Almost as soon as the case was removed, on January 16, 2007, plaintiffs filed a motion for leave to amend their complaint to delete any and all allegations *against* GE by virtue of plaintiff's exposure to the turbines on the two Navy ships. (See Riegel Aff. Ex. 2, Proposed Amended Complaint, ¶¶ 22-24.) The amended complaint left intact allegations against GE that grew out of exposure allegedly suffered by Frawley while working as a member of the merchant marine on

---

[1] Case management orders entered in the New York Asbestos Litigation substantially expedite various procedural aspects of the hundreds of cases filed in the Supreme Court, New York County. One of those orders, it seems, permits a plaintiff to file some sort of form complaint (referred to in Ex. A to the Notice of Removal as Weitz and Luxenberg P.C. Standard Asbestos Complaint for Personal Injury No. 7), rather than recreating a new complaint for each new lawsuit. A second order requires a plaintiff who has filed a lawsuit to respond immediately to a set of interrogatories that the various "usual suspects" in the asbestos cases have on file with the court. These interrogatories, which are in the nature of a bill of particulars, detail various aspects of the injuries suffered by the plaintiff and contain additional information about the alleged nature and source of the exposure.

2

ships that were owned by the federal government. The proposed amendment did not purport to dismiss any claims against any party except GE. Indeed, the amending paragraphs follow a caption that says, "Specific Allegations Pertaining to Defendant General Electric Company."

Under this court's rules, GE, as the removing party, was required to file a copy of all records and proceedings in the state court within twenty days after filing the notice of removal. Local Civil Rule 81.1(b). The court's docket sheet does not indicate that any defendant, including GE, had filed an answer to the original complaint, and nothing in either the Notice of Removal or the papers filed in support of this motion indicated that answers had been filed. Under the Federal Rules of Civil Procedure, until twenty days have passed following the filing of answers, no motion to amend is necessary; plaintiffs have an absolute right to amend their complaint one time, and they may delete any claims they wish in that amended pleading. Fed. R. Civ. P. 15(a). As far as the court is concerned, plaintiffs were amending as of right, pursuant to the rules of the court into which the case had been brought by GE.[2]

The obvious purpose of plaintiffs' amending their complaint was to avoid litigating in federal court. And indeed, the amendment of the complaint was followed, as the night the day, by the filing of a motion to remand this action.

It is important to note that, in their motion, plaintiffs do not contest the propriety of GE's removal of the case. Plaintiffs concede the obvious – the federal officer removal statute, which has been applied to government contractors, permits a federal contractor defendant to remove a case in which no federal claim is asserted, as long as the defendant intends to assert a defense dependent on federal law (i.e., federal officer immunity, based on the following of government specifications in the manufacture of the asbestos-containing product).

Instead, plaintiffs urge this court to decline to exercise supplemental jurisdiction over the remaining claims in the Amended Complaint – claims that arise entirely under state law, and in which there is allegedly no federal interest, due to the abandonment of any and all claims against GE arising out of the plaintiff's naval experience.

Plaintiffs are correct that the proper issue for the court's consideration is not whether GE could have asserted a federal immunity defense against the now-abandoned claims, but rather whether this court should retain the case now that those claims are out of the case. As the Second Circuit held in Mizuna Ltd. v. Crossland Fed. Sav. Bank, 90 F.3d 650, 655 (2d Cir. 1996), whether to retain a removed case after post-removal dismissal of all claims that made the case properly removable presents an entirely different issue than whether removal was proper in the first place – an issue that is decided in accordance with entirely different principles. Since no one contests the proposition that the case was properly removed, it is to the retention question that I now turn.

---

[2] After removal, the relevant rules of civil procedure are those of the federal court, not the state court.

3

Contrary to GE's assertion, no less an authority than the United States Supreme Court has held that a properly removed case *can* be remanded to the state court after the complaint is amended to remove the allegations that made removal proper. Carnegie-Mellon University v. Cohill, 484 U.S. 343 (1988). This has nothing to do with the propriety of the initial removal, which is the issue that GE erroneously insists on arguing. Nor is it a question of subject matter jurisdiction, as plaintiffs mistakenly contend. In Carnegie Mellon, the Supreme Court concluded that a federal court to which a complaint was properly removed had jurisdiction over the "entire action," which jurisdiction persisted following the elimination of the claims that gave rise to removal jurisdiction. The new federal supplemental jurisdiction statute, 28 U.S.C. § 1367, which was passed several years after Carnegie-Mellon, states explicitly that a federal district court, once vested with subject matter jurisdiction (as occurred upon removal in this case), has the power to exercise supplemental jurisdiction over purely pendent claims, even after the claim that gave rise to removal jurisdiction is dismissed.

So the question is not whether this court may retain the case – it may – but rather whether this court should retain the case.

The Carnegie Mellon court indicated that "in each case, and at every stage of litigation," a federal district court should consider and weigh "values of judicial economy, convenience, fairness, and comity" in determining whether to exercise supplemental jurisdiction once the federal issues are out of the case. Subsequently, Congress passed 28 U.S.C. § 1367 which, *inter alia*, set forth the factors that could lead a district court, in an exercise of its discretion, to decline to retain pendent claims or parties. In the Second Circuit, a district court may only decline to exercise supplemental jurisdiction if one of the factors enumerated in Section 1367(c) is present. Treglia v. Town of Manlius, 313 F.3d 713, 723 (2d Cir. 2002); Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 443, 448 (2d Cir. 1998). Dismissal of all claims over which a district court has original jurisdiction is one of the enumerated factors. So *if this court has indeed dismissed all the claims over which original jurisdiction exists*, I have the discretion to remand the case to the New York State Supreme Court, after considering and weighing the factors of comity, judicial economy, convenience and fairness to litigants. See Motorola Credit Corp. v. Uzan, 388 F.3d 39, 55-56 (2d Cir. 2004); Dunlop v. City of New York, No. 06-CV-433, 2006 WL 2853972, at *5 (S.D.N.Y. Oct. 4, 2006).

Factors of judicial economy and convenience clearly militate in favor of remanding this case to the New York State Supreme Court. That court is presently handling thousands of asbestos cases, under the leadership of an able and experienced jurist, who has developed appropriate procedures for expediting this class of lawsuit. That court is fully familiar with all the issues that arise in these complex product liability cases, including the relevant issues of federal law (see below), whereas this court will have a rather steep learning curve. Because of the way work is allocated in the New York State Supreme Court, the judge handling the asbestos cases has no responsibility for criminal matters, so the progress of this case toward trial will not be interrupted by the handling of criminal trials. This court, by contrast, has several criminal trials pending, and was recently assigned to handle a three defendant death penalty case, which takes

4

precedence over other matters.

GE correctly notes that its co-defendants can assert cross-claims for contribution against GE, alleging that it was plaintiff's exposure to GE's turbines on the two ships, rather than any exposure to their products, that was responsible, in whole or in part, for plaintiff's mesothelioma. Because such cross-claims would insert the issue of GE's federal contractor immunity right back into the case, GE argues that the lawsuit should remain here.

However, the potential for cross-claims that will be subject to a government contractor defense does not necessarily mean that this court ought to retain jurisdiction over what is essentially a state court matter. In other contexts, defenses and counterclaims to state law causes of action, and even cross-claims between various defendants, present issues of federal law. But removal is not available to deal with federal issues that arise in counterclaims and cross-claims. See 14B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3722 & n.21 (3d ed. 2006). As a result, state courts deal with issues of federal law all the time.

Federal actor removal represents an exception to the usual rule that the existence of a federal defense does not confer federal jurisdiction. But once the plaintiffs' claim against a government contractor is out of the case, it stretches the principle for a federal court to retain the case against the possibility that cross-claims will be pled. If plaintiff had not originally pleaded failure to warn and to maintain a safe workplace claims against GE arising out of his work for the Navy, GE could not have removed the case to this court pursuant to the federal officer removal statute, even though the potential for cross-claims implicating federal interests would have existed. GE would have had to assert its government contractor defense to those cross claims in the state court. Indeed, it is only because W&L did not originally exempt all claims against government contractors from its form complaint that this issue arises at all.[3]

GE is of course correct that there is a strong federal interest in having that issue decided as a matter of federal law. Where GE goes off the rails is in asserting that only a federal judge can apply the governing federal law to the facts of this case. No such rule exists. That the New York State courts are familiar with the government contractor defenses in appropriate cases is abundantly clear. See In re New York City Asbestos Litig., 256 A.D.2d 250, 251 (Sup. Ct. N.Y. Co. 1998).

The cases cited by GE at pages 15-18 of its brief hold only that federal rather than state *law* governs the claims of immunity that government contractors assert, not that federal rather

---

[3] As the Second Circuit has noted on more than one occasion, with respect to claims against federal officers (and, by extension, government contractors), "The Supreme Court has held that [§ 1442(a)(1)] does not furnish an independent ground for federal jurisdiction absent some federal question implicated in either the claim or by way of defense." Mizuna, 90 F.3d at 655 (citing Mesa v. California, 489 U.S. 212 (1989)); see also Parker v. Della Rocca, 252 F.3d 663, 665 n.2 (2d Cir. 2001).

5

than state *courts* must adjudicate those claims. Suggesting that only a federal court can handle such a matter is insulting to the judges of the State of New York -- especially the experienced jurist who has handled literally thousands of cases like plaintiffs' and can be trusted to know every possible nuance. Justice Freedman is perfectly capable of applying the correct law (which is federal law) to GE's immunity claim if cross-claims are asserted against it based on plaintiff's work with the Navy. Indeed, given her vast experience with asbestos litigation, she would probably do a better job of it than I could. Considerations of comity militate strongly in favor of remand.

If this court were sure that GE was the only defendant herein sued whose products were present on the two Navy ships where plaintiff briefly worked, I would not hesitate to remand the case back to the New York State Supreme Court -- where, as the above discussion suggests, I think it belongs. The problem is that I cannot remand the case until I know whether I have dismissed all of the claims over which the court has "original jurisdiction" -- which, as I understand it, includes any and every claim asserted by plaintiffs against any federal contractor who, like GE, had a right of removal under 42 U.S.C. § 1442(a)(1).[4]

Unfortunately, I have absolutely no idea whether any of the other named defendants had asbestos-containing products on either the U.S.N.S. Upshur or the U.S.N.S. General Maurice Rose, and so qualifies as a government contractor. As noted above, W&L responded to GE's notice of removal by using its one and only "of right" amendment to dismiss only claims *against GE* arising out of plaintiff's work for the Navy. W&L did not amend the pleading to dismiss similar claims against any other defendant who might have been a federal contractor on either of the Navy ships where plaintiff worked. One might conclude that none of the other defendants was eligible for federal actor status. However, in its reply brief in support of the motion to remand, W&L stated, "As for the other Defendants in this case, none of whom joined in GE's removal, they still can raise in state court their government contractor defenses to plaintiffs' failure to warn claims regarding Mr. Frawley's asbestos exposures on the two Navy ships." (Pl. Reply Br. at 4.) This court views this sentence as an implicit acknowledgment that there are other (or at least may be) other defendants who could have removed this case under 42 U.S.C. §1442(a)(1).

It is of absolutely no moment that no other defendant "joined" in GE's notice of removal. As noted above, any single federal actor can remove the case without obtaining the consent of

---

[4] The use of the phrase "original jurisdiction" is somewhat misleading. This court did not have "original jurisdiction" over any of the claims asserted in any traditional sense, since there is no federal question apparent from the face of the complaint and diversity is lacking. In this case, the only basis for removal is the existence of a "government contractor" defense on behalf of a private party who receives the benefit of federal actor status. The concept of "original jurisdiction" is not ordinarily applied to a defense; but in the federal actor context, Section 1367(c)(3) makes little sense unless the phrase "all claims over which it has original jurisdiction" is read to encompass claims as to which a government contractor defense may be asserted. The court has not found any precedent addressing this precise issue.

6

other defendants, and once the case is removed, there is no requirement that other defendants who might have been able to exercise the same right "join" in the removal in order to reap the benefit of the federal forum. If indeed there are other government contractors, they might well have elected to remove the case, had GE not done so first; but they had no need to exercise their right to remove once GE did so. This court has "original jurisdiction" (in the sense that the term is used in this case) over all claims against *all* government contractors who can assert federal actor status -- not just over the removing defendant, GE -- and Second Circuit precedent does not permit this court to remand the case if any claims over which this court has original jurisdiction remain in suit.

Additionally, considerations of fairness would weigh heavily in favor of retaining this case if there are other government contractor defendants, because those defendants have by now lost their right to remove the case due to the passage of time.

Accordingly, any defendant who plans to assert that it was a government contractor who fabricated an asbestos-containing product pursuant to a contract with the United States Navy for either or both of the vessels on which plaintiff Frawley worked must notify the court and all parties of its existence and intent to assert such a defense by March 12, 2007. If any such defendant exists, the case will remain here. If no defendant identifies itself as a Government contractor, I will assume that there are no other federal contractors in the case, and the matter will be remanded.

A final note: While plaintiffs have used their one and only "of right" amendment, they may of course move for leave to amend their complaint to remove failure to warn claims against any other Government contractors who surface. However, this court would view any such motion as "manipulative behavior" of the sort that the Supreme Court in Carnegie-Mellon said should be factored into any decision on remand, see Carnegie-Mellon, 484 U.S. at 357.

Dated: March 1, 2007

_____
U.S.D.J.

BY FAX TO ALL COUNSEL

7